**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BRIAN C. BATES, by his next friend,
Cheryl Anne Johns,
<u>Plaintiff-Appellant,</u>

v.

CHESTERFIELD COUNTY, VIRGINIA;
WAYNE GENOVA; MIKE MARRION;
DAVID B. BILLER; JOHN DOE, I; JOHN
DOE, II; JOHN DOE, III,
<u>Defendants-Appellees.</u>

No. 99-1663

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-61-3)

Argued: April 7, 2000

Decided: June 19, 2000

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Senior Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Suleman Sadiq Gill, WRIGHT, ROBINSON,
OSTHIMER & TATUM, Richmond, Virginia, for Appellant. Stylian

Paul Parthemos, Senior Assistant County Attorney, Chesterfield, Virginia, for Appellees. **ON BRIEF:** Paulo E. Franco, Jr., Renu M. Setaro, WRIGHT, ROBINSON, OSTHIMER & TATUM, Richmond, Virginia, for Appellant. Steven L. Micas, County Attorney, Jeffrey L. Mincks, Deputy County Attorney, Chesterfield, Virginia, for Appellees.

_____

**OPINION**

WILKINSON, Chief Judge:

Brian Bates brought suit against Chesterfield County, Virginia, and several of its police officers under 42 U.S.C. § 1983 and the Americans with Disabilities Act. Bates claims that the officers violated his Fourth Amendment right to be free from unreasonable seizure and discriminated against him on account of his autism. The district court granted summary judgment to the defendants. We conclude that the officers acted reasonably both in conducting the initial investigatory stop and in their use of force to restrain Bates. And as the officers complied with the Fourth Amendment in all respects, we are unable to discern any discrimination on account of disability. Accordingly, we affirm the judgment of the district court.

I.

Because the district court dismissed Bates' claims on the defendants' motion for summary judgment, we view the evidence in the light most favorable to Bates. See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 768 (4th Cir. 1997). At approximately 6:00 p.m. on September 28, 1998, Ivan Schwartz went outside his home to play with his sons. Schwartz spotted a tall, skinny, shirtless teenager on the street at the end of his driveway. Unbeknownst to Schwartz, this teenager was seventeen-year-old Brian Bates. Bates, who lived approximately two miles from Schwartz's home, has been autistic since birth. While Schwartz was talking to his boys, Bates walked up Schwartz's driveway. Schwartz told his boys to go inside.

Bates entered Schwartz's garage and walked up to a cage containing kittens. Schwartz notes that Bates was talking incoherently to the

2

kittens, making animal noises, and reaching into the cage. Schwartz twice asked Bates if he could help him, but Bates did not respond. Schwartz then said, "Look, I'm asking you a question. Talk to me." Bates still did not respond. Schwartz asked Bates for his name, but Bates again did not reply. Schwartz then asked Bates where he lived. Bates stated, "Death Valley, California." When Schwartz again asked Bates where he lived, Bates responded, "In Hell."

Schwartz was ultimately able to back Bates out of his garage and down his driveway. Schwartz again attempted to communicate with Bates. The only coherent response Schwartz received was Bates' screaming out the names of professional wrestlers. When Bates had reached the end of Schwartz's driveway, Bates ran into the woods at the end of the cul-de-sac. Schwartz immediately called 911 and told the dispatcher what had happened.

The dispatcher relayed the call to Chesterfield County police officers. Officer Wayne Genova, who at the time was working radar only a few blocks from Schwartz's home, responded and drove his police motorcycle to Schwartz's home. Upon arriving, Genova was waved down by Walter Amos, Schwartz's neighbor. Amos had witnessed the incident, and Amos and Schwartz had talked shortly thereafter. Schwartz had to leave before Genova arrived, and Amos told Schwartz he would stay and wait. Although Amos does not recall the specific words he used, he does remember telling Genova something to the effect, "I don't know if this boy is on drugs or drunk but he is acting weird or crazy and just went running through the woods."

Officer Genova, still on his motorcycle, continued searching for the individual described by Amos and the dispatcher. Genova located him on a nearby street. Genova asked Bates to come talk with him. Bates walked away. Genova then ordered Bates to come back. Bates walked over to the police motorcycle, which Genova had dismounted. Without permission from Genova, Bates sat sideways on the motorcycle. Genova responded by pushing Bates off the motorcycle.

Bates then pushed Officer Genova and walked away. Genova attempted to grab Bates, but Bates fought him off. During the struggle, Bates used his fingernails to scratch Genova's left arm. Bates then ran down the street. Genova called for backup and remounted his

3

motorcycle. Genova caught up with Bates, dismounted, and tried to grab Bates by the wrist. Bates resisted, spit on Genova, and told the officer to leave him alone. Genova grabbed Bates by the throat and wrestled him to the pavement. Genova warned Bates not to spit on him. Genova then attempted to handcuff Bates, but Bates continued to resist. Bates also bit Genova, drawing blood from the officer's left forearm.

While Genova and Bates were struggling, Richard Conroy, the Special Agent in Charge of Enforcement for the Virginia State Charitable Gaming Commission, approached them in his car. Conroy later reported, "It was immediately apparent to me that the officer was in trouble and needed assistance." Conroy got out of his car and identified himself as a law enforcement officer. The two officers then grappled with Bates and ultimately were able to handcuff his arms in front of his body.

Shortly thereafter, Officers David Biller and J.R. Boylan arrived. At this point, Bates was bucking up and down on the pavement. The four officers wrestled with Bates and were able to handcuff his arms behind his back. The officers then moved Bates to the grass at the side of the road. At some point during the struggle, Genova asked Bates what his name was and whether he was on any drugs. Bates responded that he was on a number of prescription medications. At no point did Bates inform the officers that he was autistic. While Genova was disinfecting his wounds at Officer Boylan's patrol car, Officers Biller and Boylan stood watch over Bates. Bates began to kick at the officers. He kicked Officer Biller hard directly in the groin, incapacitating the officer. The officers responded by turning Bates over and holding him face down in an attempt to prevent him from hurting them.

Around this time, Sharon Williams arrived on the scene. Williams, who knew Bates' family, informed the officers that Bates suffered from autism. Bates' mother and stepfather, Cheryl and Bill Johns, then arrived. The parents also told the officers that Bates was autistic. Bates' parents sought to approach Bates, but the officers initially kept them back. Once Bates discovered that his parents had arrived, Bates says he "spun around" to face his stepfather. The officers reacted by grabbing Bates and forcing him to the ground. One of the officers

4

grabbed Bates by his neck. Bates claims that the officers were "beating" on him as he struggled to get away.

Other Chesterfield County officers arrived on the scene. One of them urged Bates' parents to retrieve his medication, and Bates' mother went to get the medicine. While she was away, Bates' stepfather and a man identifying himself as Bates' uncle were allowed to speak with Bates. When Bates' mother returned, she gave Bates his medication. Bates eventually calmed down.

An ambulance arrived and the paramedics examined both Bates and Genova. One of the paramedics noted that Bates had "minor abrasions" on his torso. He concluded that Bates did not need further medical attention, and the paramedics did not take him to the hospital. Officer Genova, on the other hand, went to the hospital where he was tested for exposure to various diseases due to Bates' bite and scratch. Sixteen days later, Officer Biller also sought medical attention because his groin injury had not yet healed.

After consulting with the other officers at the scene, Sergeant Michael Marrion decided to charge Bates as a juvenile for assaulting Officers Genova and Biller. Marrion released Bates to his parents rather than transporting him to the detention center as the police would normally have done. Marrion thought that a night in the detention center would be detrimental to Bates given his mental disorder and aggressive behavior.**1**

On January 21, 1999, Bates filed suit against both Chesterfield County and several of its officers. Bates alleges that the officers violated his Fourth Amendment right to be free from unreasonable seizure. Bates also brought a variety of state law tort claims as well as claims that the defendants violated the Americans with Disabilities Act. See 42 U.S.C. §§ 12132, 12134 (1994). The defendants moved

_____

**1** Bates' claims are primarily concerned with the September 28 incident. In addition, Bates points to an "incident" occurring two evenings later. On September 30, the police responded to several reports that Bates was swinging a 2x4 at cars. This so-called incident, however, involved no arrest of Bates, and it is undisputed that no officer touched Bates at any time throughout the episode.

for summary judgment with respect to Bates' claims. Bates moved under Fed. R. Civ. P. 56(f) to stay disposition of the summary judgment motion until Bates could conduct further discovery. The district court granted the defendants' summary judgment motion and denied Bates' Rule 56(f) motion. Bates now appeals.

II.

A.

Bates first contends that Officer Genova violated the Fourth Amendment on September 28 when he detained Bates to ask him some questions.

We disagree. Because Officer Genova was conducting an investigatory stop and not an arrest, Genova needed only a reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). "[T]he level of suspicion required for a Terry stop is obviously less demanding than that for probable cause," and "is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). An officer merely needs "`some minimal level of objective justification' for making the stop." Id. (quoting INS v. Delgado, 466 U.S. 210, 217 (1984)). In other words, the officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." Id. (internal quotation marks omitted).

Based on the information possessed by Officer Genova at the time, his suspicion that "criminal activity may be afoot" was more than reasonable. Genova was informed by the 911 dispatcher of a "suspicious subject." The dispatcher then passed along the information reported by Ivan Schwartz -- "a white male juvenile with blonde hair [and] bad complexion, last seen wearing no shirt, baggy jean shorts, . . . walked up to [Schwartz's] garage and seemed not to comprehend where he was at, and then ran into the woods at the end of the cul-de-sac." Genova was thus aware that Bates may have trespassed on private property and might trespass again. See Va. Code Ann. §§ 18.2-119, 18.2-121 (Michie 1996). In addition, Officer Genova was informed that Bates may have been under the influence of intoxicants in public. See id. § 18.2-388. When Genova arrived on the scene, he

6

spoke with Walter Amos. Although Amos later could not recall the specific words he used, Amos remembered telling Genova something to the effect, "I don't know if this boy is on drugs or drunk but he is acting weird or crazy and just went running through the woods." With these facts in front of him, it was reasonable for Officer Genova to stop Bates and assess the situation.

B.

Bates next argues that the defendant officers violated the Fourth Amendment by using excessive force against him."[T]he question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them ...." Graham v. Connor, 490 U.S. 386, 397 (1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396.

At every stage of the September 28 incident, the police officers' use of force was objectively reasonable. Officer Genova first attempted merely to speak with Bates. Bates walked away. Genova then ordered Bates to come over to him. In approaching, however, Bates sat on Genova's police motorcycle, which he had no right to do. By taking the first step to commandeering the officer's motorcycle, Bates threatened not only Officer Genova and police property; he also put himself and the public at risk. In response, Genova simply pushed Bates off the motorcycle. Genova was surely not constitutionally required to permit an individual suspected of being intoxicated and having committed a trespass to control his police vehicle while Genova was conducting his investigatory stop.

Bates then initiated a series of physical confrontations with the police to which the officers responded in reasonable fashion. Bates pushed Officer Genova, thereby assaulting a police officer. When Genova tried to grab Bates, Bates fought him off, scratching Genova's left arm. Genova and the other officers attempted to handcuff Bates. Bates spit, bit, and kicked the officers. It ultimately required four officers to restrain Bates and to stop him from harming not only the officers but himself. And yet in light of what the district court described as Bates' "fierce resistance," the officers did not pepper spray Bates nor use their batons against him. In fact, Bates suffered

7

minimal injury from the confrontations. Bates himself reports, "As a result of the police officers' actions, I was cut, bruised and scraped." And the attending paramedic saw no need to take Bates to the hospital. See Dean v. City of Worcester, 924 F.2d 364, 369 (1st Cir. 1991) (noting that the severity of a § 1983 plaintiff's injuries is a relevant factor in determining whether force was excessive).

With respect to the force used in these confrontations, it is important to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." Graham, 490 U.S. at 396. Here, all three factors weigh in the officers' favor. First, Bates had committed the offense of assaulting a police officer. Second, Bates was an immediate threat to the officers, as evidenced by the fact that he scratched Officer Genova, bit him to the point of bleeding, and incapacitated Officer Biller by kicking him directly in the groin. Third, it is beyond question that Bates was "actively resisting arrest." In light of these factors, we simply cannot conclude that the force used by the officers was excessive.

Bates makes much of the officers' use of force in light of his mental disability. It is undisputed, however, that Bates never told the officers he was autistic. Moreover, in the midst of a rapidly escalating situation, the officers cannot be faulted for failing to diagnose Bates' autism. Indeed, the volatile nature of a situation may make a pause for psychiatric diagnosis impractical and even dangerous.

Even after the officers were informed of Bates' autism, the force used by the officers was reasonable in light of all the circumstances. For example, the police reacted with force when, in Bates' own words, he "spun around" to face his stepfather. In light of Bates' previous resistance to police -- his scratching, spitting, biting, and kicking -- the officers acted reasonably by forcibly restraining him. Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual. We do not underestimate the difficulties that an autistic individual may face in dealing with law enforcement officers. At the same time,

8

that fact cannot set aside an officer's responsibility to uphold the law and ensure public safety.**2**

## III.

Bates next contends that the defendants violated the Americans with Disabilities Act. See 42 U.S.C. §§ 12132, 12134 (1994). Section 12132 provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. § 12132. Bates alleges that his "unjustified detainment and abuse" constituted discrimination against him by reason of his disability. Specifically, Bates contends that the officers should have been aware of his autism throughout the September 28 incident and should have taken this condition into account when interacting with him. Bates argues that if they had, he would not have been detained or arrested and the ensuing scuffle would not have occurred.

We need not undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances. For in evaluating the validity of an investigatory stop, a court must consider "`the totality of the circumstances -- the whole picture.'" Sokolow, 490 U.S. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). And in examining a claim of excessive force, a court must ask whether the officers' conduct was "`objectively reasonable' in light of the facts and circumstances confronting them." Graham, 490 U.S. at 397. Just like any other relevant personal characteristic -- height, strength, aggressive-

_____

**2** Bates also contends that the district court improperly granted defendants summary judgment with respect to his state tort claims. Bates, however, concedes that "the viability of the state law claims hinges on the objective reasonableness of the Officer Defendants' actions." And as their actions were objectively reasonable, the district court properly granted summary judgment on these state law claims.

In addition, Bates argues that the district court erred by not granting his Rule 56(f) request to conduct more discovery. We agree with the district court that there was no need for further discovery.

9

ness -- a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus.

Here, we have concluded that under all the circumstances the officers' actions were objectively reasonable. Officer Genova had a reasonable, articulable suspicion that criminal activity was afoot when he conducted his initial investigatory stop. See Terry, 392 U.S. at 30-31. The officers' use of force against Bates was also objectively reasonable -- both the force used before the officers were aware or should have been aware of Bates' autism and the force used after they were notified of the disability. See Graham, 490 U.S. at 396-99. And Bates was not arrested because of his disability. Rather, he was arrested because there was probable cause to believe that he assaulted a police officer. Thus the stop, the use of force, and the arrest of Bates were not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct. Such reasonable police behavior is not discrimination. As a result, there has been no ADA violation.[3]

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

_____

[3] As the officers did not discriminate against Bates by reason of his disability, Bates' additional ADA claim that the County failed to adequately train its officers also fails.

10