PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL R. WATERMAN, Personal
Representative of the Estate of Josh
T. Waterman, Deceased; RUTH G.
WATERMAN; ROLAND M. WATERMAN,
        *Plaintiffs-Appellees,*

            v.

MICHAEL P. BATTON; KENNETH KEEL;
CHRISTOPHER HEISEY,
        *Defendants-Appellants,*

            and

STATE OF MARYLAND,
        *Defendant.*

No. 04-1096

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-02-1725-CCB)

Argued: September 30, 2004

Decided: January 3, 2005

Before WILKINS, Chief Judge, MOTZ, Circuit Judge, and
Henry E. HUDSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Chief Judge Wilkins
wrote the majority opinion, in which Judge Hudson joined. Judge
Motz wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Karen June Kruger, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellants. John J. Connolly, MURPHY & SHAFFER, L.L.C., Baltimore, Maryland, for Appellees. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Michael D. Berman, Deputy Chief of Litigation, Baltimore, Maryland, for Appellants. William J. Murphy, MURPHY & SHAFFER, L.L.C., Baltimore, Maryland, for Appellees.

## OPINION

WILKINS, Chief Judge:

Officers Michael Batton, Kenneth Keel, and Christopher Heisey of the Maryland Transportation Authority (MdTA) (collectively, "Appellants") appeal a district court order denying their motion for summary judgment based on qualified immunity in an action alleging that they unconstitutionally employed deadly force against Josh Waterman. We reverse and remand.

### I.

In reviewing the denial of summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff.[1] *See Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002). To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the

---

[1]Appellants contend that the district court erred in considering the testimony of several witnesses. We lack jurisdiction to review this issue in an interlocutory appeal of the denial of qualified immunity; rather, we must accept the facts that the district court concluded could be gleaned from the record, viewing it in the light most favorable to the plaintiff. *See Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002); *Poe v. Leonard*, 282 F.3d 123, 147 (2d Cir. 2002).

record when viewed in the light most favorable to the plaintiff. *See Winfield v. Bass*, 106 F.3d 525, 533-35 (4th Cir. 1997) (en banc). Employing these principles reveals the following facts.

On the afternoon of November 28, 2000, at approximately 3:11 p.m., Waterman was driving in the Baltimore Washington International Airport terminal area. MdTA Officer Eric Farrow observed Waterman traveling 51 miles per hour in a 25-miles-per-hour zone, and Farrow activated the emergency sirens and lights on his patrol vehicle and initiated pursuit. When Waterman did not stop, MdTA Officer Adam Watkowski, who was in another patrol vehicle, activated his sirens and lights and joined in the pursuit.

As they followed Waterman, Officers Farrow and Watkowski communicated by radio with the MdTA officers located at the toll plaza of the Fort McHenry Tunnel (the Tunnel). At approximately 3:16 p.m., Watkowski reported to Communications at the Tunnel that he was involved in a "10-80" (chase in progress) heading northbound on I-95 toward the Tunnel. Communications relayed the message to all units and identified the vehicle as a gold Mazda with North Carolina license plate MZL-1595. Appellants heard that message. Other officers stationed near the toll plaza radioed that they were standing by. One officer received permission to prepare "stop sticks"[2] in the northbound lanes on the north side of the toll plaza, and someone radioed that the sticks were being prepared.

At approximately 3:17 p.m., Officer Watkowski radioed to Communications that Waterman "just tried to run me off the road . . . he's trying to take us off the road." *Waterman v. Batton*, 294 F. Supp. 2d 709, 714 (D. Md. 2003) (alteration in original) (internal quotation marks omitted).[3] Appellants all heard that communication. Addition-

---

[2]Stop sticks disable vehicles by puncturing their tires.

[3]Video systems in Farrow's and Watkowski's police vehicles recorded most of the events leading up to and including the shooting. The resulting video has been transferred into DVD format and is in the joint appendix. The video creates some question regarding whether Waterman actually did try to run Watkowski off the road. However, it is undisputed that Appellants did not have access to this evidence when they encountered Waterman.

ally, at approximately 3:21 p.m., just after Waterman and the trailing officers entered the Tunnel, Watkowski radioed to Communications that Waterman "reached under the seat have all units 10-0" (use caution). *Id.* (internal quotation marks omitted). Officer Heisey heard the 10-0 warning, but none of the Appellants heard that Waterman had reached under his seat.

When Waterman emerged from the Tunnel approximately two minutes later, he drove toward lane 12 of the toll plaza, the left-most northbound lane.[4] By this time, the pursuit had continued for more than 10 minutes. As Waterman drove toward the plaza at a normal speed, keeping a safe distance from vehicles in front of him, five uniformed MdTA officers—Appellants and Officers Sean Hames and Lance Bellman—emerged from around the concrete island located between lanes 11 and 12. With their weapons drawn, the officers approached Waterman's vehicle from the front and passenger sides, yelling for Waterman to stop.

Waterman slowed as he approached the toll plaza, then coasted for about one second at approximately 11 miles per hour. The vehicle ahead of Waterman's then began to move forward. Immediately thereafter, the rear of Waterman's vehicle dipped down and rose back up—a motion the officers described as "lurching" or "lunging" forward—and Waterman began to accelerate in the general direction of the toll plaza and the officers ahead of him. At the instant of acceleration, Officer Keel was about 72 feet ahead of the vehicle; Officer Heisey, 38 feet ahead; Officer Hames, a little more than 23 feet ahead; and Officer Batton, a little more than 16 feet ahead.[5] Although none of the officers were directly in front of Waterman's vehicle, they stood only a few feet to the passenger side of the vehicle's projected path.[6]

---

[4]There are 24 lanes in the plaza. Lane 12 is an M-Tag lane, meaning that authorized vehicles may proceed slowly through the plaza in that lane without stopping to pay a toll.

[5]It is unclear from the record where Officer Bellman was in relation to the other officers. He does not appear to be visible in the video.

[6]The district court concluded that the record supported the inference that in the moments before the shooting none of the officers were directly

Perceiving the lurching of the vehicle and Waterman's acceleration as the beginning of an attempt to run them over, Appellants began firing their weapons as soon as Waterman accelerated. As the officers shot at him, Waterman's vehicle reached a top speed of approximately 15 miles per hour. Waterman's vehicle then passed all of the officers, avoiding them by several feet and temporarily stopping behind another vehicle blocking its path. As Appellants scrambled toward Waterman, they continued to fire their weapons at him from the passenger side of the vehicle and from behind, ceasing their fire as he passed through the toll plaza. In all, within the approximately-six-second period after Waterman's vehicle lurched forward, Officer Batton fired four rounds, Officer Keel, two, and Officer Heisey, two.

When Waterman's vehicle passed through the toll lane, it ran over the stop sticks. Officer Watkowski followed Waterman through the lane in his vehicle and collided with him, bringing both vehicles to a stop.

Waterman sustained five gunshot wounds: a shot that grazed his front right shoulder; a shot that entered the front right side of his neck and was recovered from his left shoulder; and shots that went through his right arm, right thigh, and left thigh. About two minutes after his vehicle came to a stop, several officers pulled Waterman from his vehicle and attempted to administer CPR. An ambulance then transported Waterman to John Hopkins Medical Center, where he was pro-

---

in front of Waterman's vehicle. The court, however, did not specify exactly how close to the path of the vehicle it assumed the officers were at the instant of acceleration. Some witnesses characterize the officers as approaching from the side of the vehicle or not being in front of it. Were there no video recording of the events at issue here, some of this testimony might be sufficient to give rise to a reasonable inference that the officers were so far out of the path of the vehicle as to not be in serious danger. However, any reasonable jury would have to interpret the testimony of various witnesses in light of the video recording. (No testimony suggests that the video does not properly depict the events that occurred.) Regardless of exactly where each officer was positioned when Waterman accelerated, the video leaves no doubt that at the moment of acceleration, there were officers positioned close enough to the vehicle that Waterman could have run them over in approximately one second.

nounced dead at 4:10 p.m. It was later determined that the shot that entered Waterman's neck was rapidly fatal, meaning that it killed him within 30 seconds to two minutes.

Waterman's personal representative and parents (the Estate) initiated this action in the Circuit Court for Baltimore City, alleging several causes of action under Maryland law in addition to a Fourth Amendment claim, *see* 42 U.S.C.A. § 1983 (West 2003). As is relevant here, the Estate alleged that the officers violated Waterman's Fourth Amendment rights by unjustifiably employing deadly force. Appellants removed the case to federal court and, following discovery, moved for summary judgment on several grounds, including that they were entitled to qualified immunity on the Fourth Amendment claim. The district court denied Appellants' motion in its entirety. *See Waterman*, 294 F. Supp. 2d at 739.

## II.

Appellants appeal the portion of the district court order denying their motion for summary judgment based on qualified immunity. We conclude that the district court erred in denying Appellants summary judgment on the qualified immunity issue.

## A.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Thus, government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In analyzing an appeal from the rejection of a qualified immunity defense, our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct. *See Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir. 1996). We then ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate

a violation of that right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If they do, we consider whether, at the time of the claimed violation, the right alleged to be violated was clearly established— meaning that "a reasonable official would understand that what he is doing violates" the right in question. *Id.* at 202 (internal quotation marks omitted).

Although the exact conduct at issue need not have been held unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (explaining that "[t]he fact that an exact right allegedly violated has not earlier been specifically recognized by any court does not prevent a determination that it was nevertheless 'clearly established' for qualified immunity purposes" and that "'[c]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked"). A determination that a right is clearly established may be based on controlling authority in the jurisdiction in question or on a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

The right the Estate alleges was violated here is Waterman's Fourth Amendment right to be free of unreasonable seizures, a right which includes seizures accomplished by excessive force. *See Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). The test for whether force employed to effect a seizure is excessive is one of "'objective reasonableness' under the circumstances." *Graham v. Connor*, 490 U.S. 386, 399 (1989). In determining whether force was excessive, a court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Because "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *id.* at 397, the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided, *see id.* at 396. Additionally, the reasonableness of the officer's actions in creating the dangerous situation is not relevant

to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment that force is employed. *See Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991).[7]

Here, Appellants seized Waterman by shooting him. It is important to recognize that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Nevertheless, a police officer may employ deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11.

B.

We now turn to the question of whether the record, viewed in the light most favorable to the Estate, shows that Appellants' shooting of Waterman constituted an unreasonable seizure under the Fourth Amendment. Because Appellants argue only that the use of deadly force was justified by the threat Waterman posed to them and their fellow officers—as opposed to the general public—we confine our analysis to that issue. Thus, the question before us is whether a reasonable jury could conclude, based on the evidence forecast in the

---

[7]We note that the Estate maintains that we may not revisit the conclusions of the district court regarding the reasonableness of Appellants' actions because we must accept the facts found by the district court to be reasonably inferrable from the forecasted evidence. We disagree. While we may not question the circumstances that the district court assumed in analyzing the reasonableness of Appellants' actions, the reasonableness itself—and specifically the question of what a reasonable jury could determine regarding reasonableness—is an issue that we consider de novo. *See, e.g.*, *Altman v. City of High Point*, 330 F.3d 194, 204-07 (4th Cir. 2003) (reversing district court order denying qualified immunity and concluding that officers' actions were reasonable); *Elliott*, 99 F.3d at 644 (explaining that in reviewing the denial of summary judgment based on qualified immunity, although we may not review a determination by the district court that the forecasted evidence gives rise to a reasonable inference that particular conduct occurred, we may review whether the facts assumed by the district court constituted excessive force).

record, that a perception by the officers that Waterman posed a threat of serious physical harm to them would have been unreasonable. We conclude that no reasonable jury could reach that conclusion with regard to Appellants' initial shots but that it could conclude that the shots fired after Waterman passed the officers were unconstitutional. We address the constitutionality of these two groups of shots seriatim.

1.

When Waterman's vehicle lurched forward, the officers were forced to immediately decide whether Waterman was attempting to assault the officers ahead of him or whether he intended only to drive by them, leaving them unharmed. To the extent that reasonable officers under these facts could have taken time to ponder whether the lurching of the vehicle and Waterman's acceleration were the beginning of an aggressive move toward them, they would have considered several factors suggesting that it was. Those would have included (1) that Waterman, by any account, was not acting rationally in leading the officers on a more-than-10-minute chase; (2) that he was not stopping despite seeing the officers approaching ahead of him with their weapons drawn; (3) that he was accelerating in the general direction of the officers; and, most importantly, (4) that Officer Watkowski had reported just minutes before that Waterman had attempted to run him off the road. *See Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002) ("By the time of the shooting, Davis had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which Davis was armed."). On the other hand, reasonable officers also would have considered the following factors as weighing against a conclusion that Waterman was trying to run over them: (1) that Waterman had not driven recklessly in the 27 seconds between the time he emerged from the Tunnel and the moment he accelerated in their general direction; (2) that there was no visible damage to Waterman's vehicle or the vehicles of the officers pursuing him; (3) that other than his flight, no information indicated that Waterman had committed any serious crime prior to reportedly assaulting Officer Watkowski with his vehicle; and (4) that Waterman had not yet increased his speed past 15 miles per hour or turned his vehicle so that the officers were directly in his path.

Of course, the critical reality here is that the officers did not have even a moment to pause and ponder these many conflicting factors.

*See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). At the instant that Waterman's vehicle lurched forward, the vehicle could have reached Officers Batton and Heisey in about one second even without accelerating further, and in even less time if it had continued to accelerate. Thus, if the officers paused for even an instant, they risked losing their last chance to defend themselves.

Taking into consideration all of these factors, particularly the split-second nature of the decision, we conclude as a matter of law that Appellants had probable cause to believe that Waterman's oncoming vehicle posed an immediate threat of serious physical harm at least to Officers Batton and Heisey.[8] While reasonable officers would have

---

[8]The Estate points to the opinions of some lay witnesses that Waterman's vehicle did not appear to be a threat to the officers ahead and to expert testimony that the officers' use of deadly force was unreasonable. Neither precludes Appellants' entitlement to summary judgment. Even ignoring the conclusory nature of the lay opinions, those opinions do not create a genuine issue of fact because the witnesses were unaware of the fact most critical to the probable cause analysis: that Waterman had reportedly attempted to use his vehicle as a weapon in order to avoid being captured only minutes before entering the toll plaza. *See Pace*, 283 F.3d at 1280 & n.11 (holding that lay witness opinion that approaching vehicle "[did not] appear to be a threat to any officer on the scene" did not warrant denial of summary judgment because the witness was not aware of the events that preceded the shooting that gave the officers reason to believe that suspect would attempt to assault them (internal quotation marks omitted)). Nor is summary judgment precluded by the Estate's expert's opinion that Appellants' actions were unconstitutional. "Opinions, be they expert or lay, are only as good as the evidence upon which they are based." *Id.* at 1280 n.11; *cf. Washington v. United States*, 214 F.2d 33, 43 (9th Cir. 1954) (concluding that expert opinions did not support jury verdict, in part because "[o]pinion evidence is only as good as the facts upon which it is based" and record did not support opinions). Here, for the reasons stated, the record demonstrates that the officers' perception of an immediate threat—whether correct or not—was clearly reasonable and therefore that their initial use of deadly force was justified.

recognized the possibility that Waterman intended only to accelerate *by* them rather than *at* them, they also—in the instant they had to decide—could have interpreted the acceleration in the face of their show of force as the initiation of a second attempt by Waterman to avoid capture by using his vehicle as a weapon against law enforcement personnel. *See Garner*, 471 U.S. at 11 (holding that an officer may use deadly force when a fleeing suspect "threatens the officer with a weapon"). Thus, although Appellants could have held their fire and taken the chance that Waterman's acceleration in traffic was not for the purpose of committing another assault against an officer, "[t]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm."[9] *Elliott*, 99 F.3d at 641.

In denying Appellants' motion for summary judgment, the district court relied heavily on the fact that none of the officers were *directly* in the path of Waterman's vehicle at the moment it lurched forward and the officers opened fire. In so doing, the court cited several cases for the proposition that when an officer attempts to justify his use of deadly force against the driver of an oncoming vehicle by claiming that he was trying to prevent the vehicle from running someone over, the position of the person relative to the path of the vehicle is important. *See Hernandez v. Jarman*, 340 F.3d 617, 620-21, 623-24 (8th Cir. 2003); *Abraham v. Raso*, 183 F.3d 279, 293-94 (3d Cir. 1999); *Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1146-47 (9th Cir. 1996); *Fraire v. City of Arlington*, 957 F.2d 1268, 1274-76 (5th Cir. 1992). We most certainly agree with this general proposi-

---

[9]The situation Appellants faced here—having to determine in a split-second whether a suspect is using his vehicle as a weapon—is analogous to the scenario of an officer forced to make a split-second decision as to whether to use deadly force against a suspect who he believes has a firearm. *See, e.g.*, *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (holding that use of deadly force was justified against a suspect when officer, forced to make a split-second decision, relied on his reasonable belief that another officer had seen a gun in the suspect's hands even though the suspect's hands were handcuffed in front of him and the defendant officer never saw a weapon); *Slattery v. Rizzo*, 939 F.2d 213, 215-17 (4th Cir. 1991) (holding that use of deadly force was justified when suspect in vehicle repeatedly refused orders to raise his hands and the officer perceived that he was holding something).

tion. And here, the closeness of the officers to the projected path of Waterman's vehicle is crucial to our conclusion that deadly force was justified. Any reasonable factfinder considering all of the forecasted evidence in the record would determine that Waterman was accelerating in Appellants' general direction and that Officers Batton and Heisey could have been run over in about one second if Waterman had turned slightly toward them.

*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003), is instructive on this point. There, a man attempted to steal the vehicle of an off-duty police officer from a gas station parking lot. *See Scott*, 346 F.3d at 754. As the officer yelled from behind the automobile for the man to stop, the man backed up quickly, either attempting to run the officer down or acting recklessly with respect to that possibility. *See id.* at 754, 758. When the thief stopped backing up and began to speed off through the parking lot, the officer began firing and continued to do so when the vehicle exited the parking lot. *See id.* at 754-55. One of the officer's shots killed the thief. *See id.* at 755. On appeal from the grant of summary judgment to the officer in the subsequent § 1983 suit, the Seventh Circuit held that the use of deadly force was justified to protect bystanders from the oncoming stolen vehicle. *See id.* at 758-59. The court specifically rejected the contention that the fact that no bystanders were in the direct path of the vehicle precluded the use of deadly force when several people were in the immediate vicinity of the path. *See id.* at 759. Of course, *Scott* differs from the case at bar in that in *Scott* much of the concern was probably that the thief would *accidentally* hit someone, while the concern here is that Waterman would again intentionally use his vehicle as a weapon. But just as the officer in *Scott* had reason to believe that the thief's recklessness might cause him to turn out of his then-current projected path, here Appellants had reason to believe that Waterman's aggressiveness toward officers trying to capture him suggested he was about to turn toward officers not yet in his direct path.

In sum, the officers here were faced with a suspect well positioned to seriously injure or kill one or more of them with his vehicle—possibly within a fraction of a second—if they did not employ deadly force. According to the best information available, the suspect had used his vehicle as a weapon against another officer just minutes before. Based on this information and the other factors discussed, we

hold as a matter of law that a reasonable officer could have believed at the instant of acceleration that Waterman presented a threat of serious physical harm. Appellants thus were entitled to qualified immunity regarding the initial group of shots.

## 2.

The Estate maintains that even if the initial shots were justifiable, the same was not true of the shots fired after Waterman's vehicle passed the officers and the officers were out of danger (the subsequent shots). Appellants rely on *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), in support of their argument that the subsequent shots, which occurred mere seconds after the initial shots, should not be analyzed separately. We conclude, however, that separate analysis is appropriate.

In *Rowland*, a law enforcement officer, Officer Perry, saw a woman drop a five dollar bill, which Rowland retrieved without attempting to return it. *See Rowland*, 41 F.3d at 171. Perry approached Rowland and, at Perry's request, Rowland offered the money to the woman, who refused it, claiming that it was not hers. *See id.* Perry could not hear the words between the two, but believed that Rowland "simply waved the money in the face of [the] openly distressed and tearful" woman. *Id.* Perry pursued Rowland and eventually grabbed his collar and jerked him around. *See id.* at 171-72. Frightened, Rowland instinctively tried to escape Perry's grasp. Perry then punched Rowland, threw him to the ground, and "thr[ew] his weight against Rowland's right leg and wrench[ed his] knee until it cracked." *Id.* at 172.

In concluding that Perry was not entitled to qualified immunity in Rowland's subsequent lawsuit, this court stated the following:

> In his appraisal of the objective reasonableness of the force used against Rowland, Perry urges what amounts to a segmented view of the sequence of events. He emphasizes the resistance offered by Rowland during the struggle with Perry, separating this fact from the rest of the story. This resistance alone, he argues, is enough to make Perry reasonably believe that force was necessary. Furthermore, the

defendant divides the use of force into two parts. First, Perry initially grabbed Rowland's collar in response to his attempts to flee. Second, Perry escalated the use of force in response to Rowland's resistance, culminating in the leg-twisting maneuver that finally subdued the suspect. Viewed in this way, each distinct act of force becomes reasonable given what Perry knew at each point in this progression.

This approach seems to us to miss the forest for the trees. The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness. This view is supported by the decision in *Tennessee v. Garner*, which held that the question is "whether the totality of the circumstances justified a particular sort of . . . seizure."

*Id.* at 173 (alteration in original) (citation & internal quotation marks omitted). In the end, we denied Perry qualified immunity because it was "impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill." *Id.* at 174.

Appellants maintain that reviewing the constitutionality of the subsequent shots separately from that of the initial shots would constitute just the sort of "[a]rtificial divisions in the sequence of events" that we refused to undertake in *Rowland*. Appellants' argument is not without support. In characterizing Perry's approach as "miss[ing] the forest for the trees," *Rowland* is unclear regarding whether it rejects (a) the notion that the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds, or (b) the idea that any of the events should be reviewed outside the context of the conduct that precipitated the seizure—there, the simple failure to return a five dollar bill.

Although both readings are plausible, we conclude that the latter reading is the better one. It is established in this circuit that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed. *See Elliott*, 99 F.3d at 643. To simply view all of the force employed

in light of only the information possessed by the officer when he *began* to employ force would limit, for no good reason, the relevant circumstances to be considered in judging the constitutionality of the officer's actions. We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated. *See Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) (finding issue of fact regarding whether officer was justified in firing on vehicle from side after stepping out of the way to avoid being run over, and explaining that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect"); *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (noting that analyzing separate segments of single encounter may be appropriate if "the officers' initial decision to shoot was reasonable under the circumstances but there was no need to continue shooting"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (holding that when fleeing felon tossed a mesh bag weighing four or five pounds toward the officer, the officer would have been justified if he fired at that moment out of fear that the bag might knock his firearm out of his hand, but that he was not justified in firing after bag hit him and fell to the ground without injuring him and suspect turned and ran); *see also Bates ex rel. Johns v. Chesterfield County*, 216 F.3d 367, 371-72 (4th Cir. 2000) (concluding with regard to escalating physical confrontation between officer and resisting suspect that officer's use of force was reasonable "[a]t every stage of the . . . incident"); *Hopkins v. Andaya*, 958 F.2d 881, 886-88 (9th Cir. 1992) (per curiam) (dividing several-minute encounter into two segments and holding that even if the first application of force was constitutional, the second may not have been).

Applying this principle here, we conclude that the record, viewed in the light most favorable to the Estate, shows that once Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots. A factfinder could reasonably conclude that as the officers pursued Waterman's vehicle, they knew or should have known that Waterman had passed them without veering in their direction. Under these circumstances, a reasonable factfinder could determine that any belief that the officers continued at that point to face an imminent threat of serious physical harm would be unreasonable.

## C.

Having determined that the record, when viewed in the light most favorable to the Estate, shows that the subsequent shots were unconstitutional, we now consider whether that unconstitutionality was clearly established on November 28, 2000, when the shooting occurred. We conclude that it was not and thus that Appellants were entitled to qualified immunity for the subsequent shots as well.

As we have discussed, a necessary premise to our conclusion that the forecasted evidence could demonstrate the unconstitutionality of the subsequent shots is that an imminent threat of serious physical harm to an officer is not sufficient to justify the employment of deadly force seconds after the threat is eliminated if a reasonable officer would have recognized when the force was employed that the threat no longer existed. That proposition was not clearly established in Maryland on November 28, 2000.

Our analysis of this issue begins with *Pittman v. Nelms*, 87 F.3d 116 (4th Cir. 1996). There, two law enforcement officers, Banks and Nelms, had an ongoing feud with Timothy Hudson. *See Pittman*, 87 F.3d at 119. One day in May 1992, Hudson began to drive away in his vehicle as Banks approached him; Banks' arm became entangled in the vehicle, resulting in Banks being dragged for 25 or 30 feet. *See id.* at 118, 120. When the vehicle turned to the right, Banks was thrown to the side. *See id.* at 120. He picked himself up, ran toward the vehicle, and fired at it as it sped away. *See id.* Nelms fired at the same time, injuring Pittman, a passenger in the automobile. *See id.* When Nelms fired, the vehicle was approximately 25 feet in front of him, and moving away, and Nelms could see that Banks had not been run over and that he was no longer in danger. *See id.* We held that because "the entire series of events took only a few short seconds," during which Banks was in serious danger, and because the situation was "tense, uncertain, and rapidly evolving," the force employed was not excessive under clearly established law. *Id.* (internal quotation marks omitted).

There is no relevant distinction between the facts in *Pittman* and those here. In both cases, the officers employing deadly force had information that the suspect had recently assaulted an officer with his

vehicle. Also, both cases presented tense, rapidly changing situations, where the threat justifying the use of deadly force ended only seconds before the shots in question were fired. In light of our holding that Nelms' use of deadly force was not excessive under law that was clearly established in May 1992, the same must be true of the subsequent shots here.[10]

The question thus becomes whether the excessiveness of the force employed here, although unclear in May 1992, was nonetheless clarified prior to November 28, 2000. We conclude that it was not. We have already noted that other circuits decided during this period that a passing risk to an officer does not authorize him to employ deadly force moments after he should have recognized the passing of the risk. *See Abraham*, 183 F.3d at 294; *Dickerson*, 101 F.3d at 1162 n.9; *Ellis*, 999 F.2d at 247. However, this circuit did not. Indeed, as we have discussed, we issued a decision, *Rowland*, that was susceptible to the reading that an application of force that extends for but a few seconds cannot be parsed into temporal segments for the purpose of reviewing each act in light of the information the officer had at that moment. *See Dickerson*, 101 F.3d at 1162 n.9 (interpreting *Rowland* in this way). Considering the uncertainty created by *Pittman* and *Rowland* regarding whether an officer may legally employ deadly force in response to a threat of serious harm moments after he should have known that the threat had been eliminated, we hold that the unconstitutionality of the subsequent shots was not clearly established in Maryland in November 2000.

III.

In sum, we reverse the denial of summary judgment to Appellants

---

[10]It is important to note that *Pittman* does not preclude our earlier holding that the subsequent shots—viewed in the light most favorable to the Estate—were unconstitutional. *Pittman* addressed only whether the force there was excessive under the law *clearly established* in May 1992. *See id.* It did not decide whether the force was in fact excessive. *See id.* at 119 & n.2 (explaining this distinction).

on the Fourth Amendment claim and remand for further proceedings consistent with this opinion.[11]

*REVERSED AND REMANDED*

DIANA GRIBBON MOTZ, dissenting:

With respect and regret, I dissent.

Law enforcement officers face some of the most grueling, difficult, and dangerous work in our communities; they are called upon to make "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). All of us are, and should be, grateful to those who accept these challenges on our behalf.

However, we cannot let our gratitude and admiration erode the limits the Constitution imposes on the use of force by police officers — especially fatal force. The hazards of police work simply do not authorize officers to engage in the unbridled use of force. No matter how exasperated an officer becomes, the Constitution does not permit him to shoot a motorist for speeding — unless a reasonable officer in the same position would have had probable cause to believe it necessary to protect himself or others from "a threat of serious physical harm." *Id.* at 396; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

In this case, Officers Michael Batton, Kenneth Keel, and Christopher Heisey fired nine rounds of ammunition at a car driven by Josh Waterman, who sustained five gunshot wounds and died rapidly from those injuries. Ten minutes before the shooting, Josh Waterman had driven 51 m.p.h. in a 25 m.p.h. zone and failed to stop when signaled to do so by officers in squad cars, which may well have exasperated them. However, by the time of the shooting, Josh Waterman was nei-

---

[11]The Estate suggests that if we conclude that the facts assumed by the district court do not create a genuine issue of fact on the issue of qualified immunity, it should be permitted to argue that the district court did not properly view the record in the light most favorable to the Estate. However, the Estate does not specify any errors made by the district court in this regard, and we are not aware of any.

ther speeding nor driving erratically — rather, he was passing through a toll plaza at 11 to 15 m.p.h.; and several eyewitnesses have sworn that none of the law enforcement officers at the toll plaza were in danger of being hit by Josh Waterman's car. The video of the shooting could well be interpreted as supporting or, at the very least, not definitively negating these accounts.

A jury could, nonetheless, conclude that a reasonable police officer, confronted with the situation facing Officers Batton, Keel, and Heisey, would have acted as they did or would not have realized that shooting Josh Waterman violated the Constitution. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). But so finding would require resolution of several genuine disputes of material fact, which we can no more resolve on interlocutory appeal than the district court could when ruling on the officers' motion for summary judgment.

In a thorough opinion, replete with numerous references to the record, the district court carefully detailed the material factual disputes requiring the denial of summary judgment. *See Waterman v. Batton*, 294 F.Supp.2d 709 (D.Md. 2003). I cannot add to, or improve upon, the district court's excellent opinion. I would affirm the judgment of the district court.