UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-2098

CAROL PETHTEL, Individually and in her capacity as
Administratrix of the Estate of Thomas Samuel Pethtel, Jr.,
Deceased, and as Guardian Ad Litem for T.B., T.P., and
T.S.P., III,

Plaintiff - Appellant,

v.

WEST VIRGINIA STATE POLICE; DAVID L. LEMMON, Colonel,
Superintendent of the West Virginia State Police; GERALD L.
MENENDEZ, Sergeant; CHARLES F. TRADER, Sergeant; DAVID B.
MALCOMB, Sergeant; SCOT L. GOODNIGHT, Sergeant; R. L.
MEFFORD, Corporal; J. A. SIMMONS, Individually and in their
capacity as members of the Special Response Team -- Alpha
Team of the West Virginia State Police; T. L. PHILLIPS,
Captain, State Police Commanding Officer in Ohio County,

Defendants - Appellees.

Appeal from the United States District Court for the Northern
District of West Virginia, at Wheeling. Frederick P.
Stamp, Jr., Senior District Judge. (5:06-cv-00087-FPS)

Argued: October 30, 2009           Decided: December 31, 2009

Before NIEMEYER, MOTZ, and DAVIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Peter Michael Suwak, Washington, Pennsylvania, for
Appellant.  Michael Deering Mullins, STEPTOE & JOHNSON, LLP,

Charleston, West Virginia, for Appellees.  **ON BRIEF:** Robert L. Bailey, STEPTOE & JOHNSON, LLP, Charleston, West Virginia, for Appellees.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a West Virginia State Police officer shot and killed a fugitive while he was holding a hostage, the deceased's mother, Carol Pethtel, brought this action against the State Police and several individual officers. Ms. Pethtel asserts that the officers employed unconstitutionally excessive force and seeks money damages pursuant to 42 U.S.C. § 1983 (2006) and state law. The district court granted summary judgment to the State Police and the individual officers. For the reasons that follow, we affirm.

I.

In July 2004, West Virginia convicted Thomas Pethtel, Jr. of drug possession with intent to distribute. The court allowed Pethtel to wear a tracking device and stay with his sister pending sentencing. Pethtel removed the tracking device and fled with his girlfriend, Randi Scott, to George Schlosser's house. Schlosser's roommate, Patricia Grinage, testified at deposition that Pethtel feared capture; he "listen[ed] in on phone conversations," threatened to harm anyone who called the police, and required at least one of the residents to stay at the house with him at all times.

Frightened that Pethtel would kill her, Grinage telephoned the police when out of the house. She relayed the following:

3

Pethtel was at Schlosser's house and acting paranoid. He had a gun and had asked her to purchase hollow point bullets. He had said "he wasn't going back to jail[,] and he wasn't going by himself if he had to die." He did not want the residents of the house to exit simultaneously. He had been using drugs. He had already fired the gun once during an argument with Randi Scott, although the actual discharge may have been accidental.

After Grinage called the police, the West Virginia Special Response Team ("SRT") prepared to take Pethtel into custody. In investigating Pethtel prior to entering the Schlosser house, the police also discovered that Pethtel was a large man who had been convicted of multiple felonies and who had a "history of . . . fighting with police."

On the night of July 14, 2004, six SRT officers entered the Schlosser house through the back door. Sgt. Gerald Menendez immediately threw a flash bang device into the house to stun the occupants; George Schlosser then submitted to police control. Sgt. Charles Trader found a small handgun on the coffee table and secured it. The officers then entered a bedroom and saw Pethtel drag Randi Scott, who was at least a foot shorter than Pethtel, into an adjoining bathroom. Once in the bathroom, Pethtel started kicking a hole through the wall into the washer-dryer area. Sgt. David Malcomb threw another flash bang behind

4

the washer-dryer to "disrupt" Pethtel and force him out of the bathroom.

As the officers worked to persuade Pethtel to surrender, Scott screamed for help and "wav[ed] her hands." Pethtel shouted to the officers, "[B]ack the fuck off, or I'm going to fucking cut her throat. . . . I'm going to kill her. I'm going to cut her fucking throat."[1] Sgt. Malcomb recounted that "the whole time" Pethtel had Scott "by the throat." Scott was "screaming, please don't let him kill me . . . screaming, bloody, just a major blood curdle."

When Sgt. Malcomb realized that Pethtel was "not rational," "not listening," and threatening Scott with immediate danger, he ordered his officers to shoot Pethtel when possible. Pethtel eventually "bust[ed] through the wall" into the washer-dryer area, and Sergeant Menendez shot him in the face through the hole in the wall. Pethtel survived. By all accounts, the house went silent for a short time -- as little as ten seconds and as long as a minute. The officers then kicked the bathroom door open, and Sgt. Trader shot Pethtel a second time. Ms. Pethtel

---

[1] Scott testified at deposition that Pethtel simultaneously whispered to her that he would not hurt her. However, Scott also testified that the officers could not hear those whispers and that she screamed for help because she was "totally scared and freaked out" and "d[id not] want to die."

maintains that the second shot -- and the second shot alone -- constitutes excessive force.

The parties dispute the circumstances surrounding the second shot. Ms. Pethtel argues that Pethtel lay motionless and incapacitated; the officers respond that Pethtel was standing and yelling. In an unsworn statement taken shortly after the shooting, Scott told an investigating officer that, after the first shot, Pethtel "wasn't moving" and "wasn't resisting." Scott later clarified in deposition that, while she was "pretty positive" that he was lying down after the first shot, she "was actually laying in front of him, so it might have looked like he was holding [her]." She explained that she was "under the influence of crack at the time," and everything was "moving very fast." Scott seems to have testified that at the moment the officers opened the bathroom door, Pethtel held her in front of him and "had something in [her] neck," but her testimony on this point is confusing. All witnesses agree that Pethtel did not surrender to the police.

In addition to Scott's unsworn statement, Ms. Pethtel presented expert testimony that "the path of the bullet in the body is consistent with him . . . sitting on the floor." The expert elaborated that, because a head can swivel, any testimony he could give about the bullet's trajectory through the body would not "tell a jury one way or the other whether Mr. Pethtel

6

was standing or seated at the time he was shot." He submitted a supplemental report stating that the pattern of blood in the bathroom was consistent with Pethtel not having been standing at the time of the second shot. The court excluded the anticipated testimony regarding the pattern of blood in the bathroom because it "was not in the written report provided to the defendants within the time set by this Court's scheduling order as extended, and was, therefore, improperly made."[2]

At the conclusion of discovery, the State Police and the individual officers moved for summary judgment.

## II.

The district court issued a well-reasoned opinion in which it granted summary judgment to the State Police and the individual officers. Pethtel v. West Virginia State Police, 568 F. Supp. 2d 658 (N.D. W. Va. 2008). The court determined that the officers did not use excessive force against Pethtel and that, even if they had, qualified immunity shielded them from liability for money damages.

---

[2] Ms. Pethtel appeals the district court's order striking plaintiff's supplemental expert report. The claim lacks merit. The district court did not abuse its discretion in excluding the report. See Carr v. Deeds, 453 F.3d 593, 601-02 (4th Cir. 2006).

III.

Pethtel now appeals to this court. We review a grant of summary judgment de novo, examining the facts in the light most favorable to the nonmoving party. Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001).

After careful consideration of the record, briefs, oral arguments, and applicable law, we affirm on the basis of the district court's well-reasoned opinion. See also Graham v. Connor, 490 U.S. 386, 388 (1989) (reasonableness inquiry must account "for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation"); Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (courts determine "the reasonableness of an officer's actions . . . based on the

information possessed by the officer at the moment that force is employed").[3]

AFFIRMED

---

[3] In _Waterman_, we held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated," but upheld immunity because the rule was not clearly established at the time of the force in that case. _Waterman_, 393 F.3d at 481. Ms. Pethtel argues that the _Waterman_ rule applies to abrogate immunity here. We disagree. First, the particular chaotic and dangerous circumstances surrounding the fatal shot in this case justified the challenged force. Second, we issued the _Waterman_ opinion in January of 2005, almost six months _after_ Pethtel's death. At that time, the _Waterman_ rule was not clearly established law in this circuit.