<u>UNPUBLISHED</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1382**

ESTATE OF TARIK K. RODGERS, by and through his administrators Michael Rodgers and Brenda Rodgers; MICHAEL RODGERS, as parent of the decedent; BRENDA RODGERS, as parent of the decedent,

Plaintiffs - Appellants,

versus

STEVE SMITH, individually and in his official capacity as Chief of Police of the City of Williamston Police Department, North Carolina; KEITH ROACH, individually and in his official capacity as the Sheriff for Martin County; WALTER J. FARROW, III, individually and in his official capacity as a Martin County Deputy Sheriff; WILLIAM R. WATERS, JR., individually and in his official capacity as a Williamston North Carolina police officer; MELANIE COX, individually and in her official capacity as a Williamston North Carolina police officer; CHARLIE BROWN, individually and in his official capacity as a Williamston North Carolina police officer; ELVIE FORNEY, III, individually and in his official capacity as a Williamston North Carolina police officer; SCOTT MCFARLAND, individually and in his official capacity as a Martin County Deputy Sheriff; BRIAN EDMONDSON, individually and in his official capacity as a Martin County Deputy Sheriff; BRIAN HARDISON, individually and in his official capacity as a Williamston North Carolina police officer; TRAVIS COWAN, individually and in his official capacity as a Williamston North Carolina police officer; STACEY PIPPIN, individually and in his official capacity as a Williamston North Carolina police officer; DAVID CROSS,

individually and in his official capacity as a Martin County Deputy Sheriff; THE CITY OF WILLIAMSTON, NORTH CAROLINA,

Defendants - Appellees,

and

DONNIE PITTMAN, individually and in his official capacity as the County Manager for Martin County, North Carolina; MARTIN COUNTY, NORTH CAROLINA,

Defendants.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern.  Malcolm J. Howard, District Judge.  (CA-03-44-4-H)

---

Argued:  December 1, 2005                    Decided:  June 26, 2006

---

Before WILKINS, Chief Judge, GREGORY, Circuit Judge, and Walter D. KELLEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by unpublished opinion.  Chief Judge Wilkins wrote the majority opinion, in which Judge Kelley joined.  Judge Gregory wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:** Teresa Louise Smallwood, Windsor, North Carolina; Robert Arlington Berry, Harrisburg, Pennsylvania, for Appellants.  **ON BRIEF:** Gary S. Parsons, BAILEY & DIXON, Raleigh, North Carolina; Mark Allen Davis, WOMBLE, CARLYLE, SANDRIDGE & RICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:** K. Jameson Lawrence, Baltimore, Maryland, for Appellants.  Gavin B. Parsons, BAILEY & DIXON, L.L.P., Raleigh, North Carolina, for Appellees S. Smith, W. R. Waters, M. Cox, C. Brown, E. Forney, B. Hardison, T. Cowan & City of Williamston.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

WILKINS, Chief Judge:

The Estate of Tarik K. Rodgers (the Estate) brought this federal civil rights action, see 42 U.S.C.A. § 1983 (West 2003), claiming violations of the Fourth Amendment in connection with the death of Tarik Rodgers (Rodgers). The Estate now appeals a decision of the district court granting summary judgment, on the basis of qualified immunity, to certain of the defendants.[1] For the reasons set forth below, we affirm.

I.

The pertinent facts, viewed in the light most favorable to the Estate, see Wilson v. Flynn, 429 F.3d 465, 466 (4th Cir. 2005), are as follows. On April 14, 2002, a Martin County, North Carolina Sheriff's deputy served a restraining order on Rodgers. The order prohibited Rodgers from coming into contact with his girlfriend, Angela Freeman, and their two children.

At approximately 10:00 that evening, Rodgers drove to Freeman's house and abducted her at gunpoint. He drove her to a remote area, where they discussed the protective order. After resolving their differences, they engaged in consensual sex. Rodgers was upset about his conduct that evening and wondered aloud

_____

[1]The district court had previously dismissed other claims against these defendants and the claims against other defendants. The Estate does not appeal those dismissals.

3

to Freeman how he was going to explain himself to their children. At one point he asked Freeman to shoot him, but she refused.

Around midnight, Rodgers drove by Freeman's home to see if any police officers were there. (Although Rodgers had warned those present in Freeman's home not to call the police, the police had nevertheless been contacted and informed that Rodgers had abducted Freeman at gunpoint.) Rodgers eventually passed a patrol car and "took off." J.A. 93 (internal quotation marks omitted). A high-speed chase ensued that involved Martin County Deputy Sheriff Walter Farrow and City of Williamston, North Carolina police officers William Waters, Elvie Forney, Melanie Cox, and Charles Brown. The chase, which continued until nearly 2:00 a.m. on the morning of April 15, was later joined by Scott McFarlane, a plain-clothes narcotics officer from another jurisdiction. The officers engaged in the chase were aware that Rodgers had abducted Freeman and that he was considered armed and dangerous.

Rodgers ended the chase by stopping abruptly in a parking lot, causing Officer Waters to crash into the rear of Rodgers' vehicle. Officer Waters exited his vehicle with his trained police dog. Officer Waters released the dog, which mistakenly attacked Officer McFarlane, biting him on the left leg.

As Officer Waters was commanding the police dog to release Officer McFarlane, Rodgers was attempting to exit his vehicle through the damaged driver's side door, and the other officers who

4

had been involved in the chase were approaching Rodgers' vehicle. Freeman, who was still in the passenger seat of the automobile, heard Rodgers saying "holdup" as he tried to get out. Id. at 109. Rodgers had his hands up and, at that point, had nothing in them. However, Freeman did not notice whether Rodgers' weapon, which had been between his seat and the center console, was still there. As Rodgers emerged from the car, Freeman could only see his left side, not his right.

Officer Brown grabbed Rodgers by the shirt to get him out of the car. Rodgers did not have a weapon at that time, but as Brown was pulling him out of the vehicle, Rodgers leaned back in and grasped his firearm. Officer Brown yelled "Gun!" and backed away from the vehicle. Officer Waters heard this warning and saw Rodgers emerging from his vehicle. Officer Waters did not see a weapon,[2] but he observed that Rodgers had his right hand under his shirt. Deputy Farrow, however, did observe Rodgers emerge from his vehicle with a firearm in his right hand. Officer Waters deployed the police dog, which initially engaged Rodgers by the arm.

_____

[2]The record contains three evidentiary items concerning Officer Waters' observations: the State Bureau of Investigation (SBI) statement he made shortly after the incident, an affidavit sworn in late November 2004, and a transcript of his deposition testimony, given in October 2004. The affidavit indicates that Officer Waters saw Rodgers with a firearm before he deployed the police dog, while the SBI statement indicates that he did not see the weapon until after the deployment. Officer Waters' deposition testimony (at least the portion included in the record) does not directly address this topic. We assume the truth of the SBI statement, as that is most favorable to the Estate.

5

Officer Waters then saw Rodgers point the firearm at him (Officer Waters). In the ensuing seconds, Officer Waters and Deputy Farrow fired their weapons. Bullets from Officer Waters' firearm struck Rodgers multiple times, killing him.

Some of the events surrounding the shooting were captured on videotape by a camera located in Officer Forney's patrol vehicle. The recording begins as Officer Forney turns his vehicle to approach the crash scene. Officer Forney stopped behind Deputy Farrow's vehicle, thus placing Deputy Farrow's vehicle between the video camera and Rodgers' and Officer Waters' vehicles.

At 1:50:56 on the recording, Deputy Farrow can be seen in the center of the screen, climbing up the side of his vehicle from behind the open driver's side door. (He later testified that he was trying to stay out of the way of the police dog.) Officer McFarlane is to the left of Deputy Farrow's vehicle, crouched on the ground with his firearm in his right hand. At 1:51:01, Officer Waters comes into view from the left of the screen with the police dog. Officer Waters brings the dog forward a few feet and releases it, at which point the dog is out of view in front of Deputy Farrow's vehicle. Having released the dog, Office Waters moves forward a few more steps and appears to be quite close to Rodgers.

As Officer Waters deploys the dog, Rodgers can be seen. Because of the location of Deputy Farrow's vehicle with respect to the video camera, Rodgers at first is viewable only through the

back and front windshields of Deputy Farrow's vehicle. He appears to be leaning slightly forward, and his arms are contrasted against the white shirt he is wearing. At 1:51:03, Rodgers appears to rise up, raising his left arm. Deputy Farrow is standing on the ground behind the driver's side door of his vehicle, and Officer McFarlane is kneeling a few feet to the left. Both officers have their weapons drawn. At 1:51:04, Rodgers' left arm has come down and he is falling backward, evidently having been engaged by the police dog. Officer McFarlane is now standing on his uninjured right leg. At 1:51:06, Rodgers is out of view, Officer Brown is backing away, and Officer McFarlane has advanced a small distance. Officer Forney comes into view on the left, behind the other three officers.

Rodgers appears again at 1:51:07, coming toward the officers as he falls. Rodgers has moved to the left of Deputy Farrow's vehicle and is no longer obscured by it. He is moving sideways and is facing the video camera; thus, he is falling to his right, toward the officers. Two muzzle flashes can be seen as Officer Waters draws and fires his weapon. As Rodgers falls to the ground, his firearm can be seen leaving his hand and landing a few feet away. At 1:51:08, Rodgers is on the ground and now unarmed, and Officer Waters fires again. At 1:51:10-11, three more muzzle flashes are seen from Officer Waters' weapon. The other officers--except Deputy Farrow, who continues to use the door of

7

his vehicle as a shield--back away as the incident ends. Rodgers is lying on the ground but is still being pulled by the police dog, which is out of view but evidently has engaged Rodgers' leg. The time elapsed from when Rodgers first appears on the video recording until the firearm is seen leaving his hand is no more than seven seconds.

Rodgers was transported to the hospital and pronounced dead. Examination of the body revealed that Rodgers had been shot multiple times in the head and body. He also exhibited bite marks on his right arm, hand, abdomen, and thigh. It is undisputed that shots fired by Officer Waters killed Rodgers; Deputy Farrow discharged his weapon but did not hit Rodgers, and Officer McFarlane never discharged his weapon.

The Estate subsequently brought this action alleging multiple claims against the officers involved in the shooting, other individuals, and Martin County and the City of Williamston. As is relevant here, the Estate alleged that Rodgers' Fourth Amendment rights were violated by the deployment of the police dog without prior warning and by the use of deadly force by Deputy Farrow and Officer Waters. We address each of these claims below.

II.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to

the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986); it protects law enforcement officers from "bad guesses in gray areas" and ensures that they are held liable only "for transgressing bright lines," Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Because qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation," Saucier v. Katz, 533 U.S. 194, 200 (2001) (internal quotation marks omitted), the question of its applicability should ordinarily be resolved at the summary judgment stage, see Willingham v. Crooke, 412 F.3d 553, 558 (4th Cir. 2005).

When a defendant asserts entitlement to qualified immunity, the court must consider two questions. The first is "whether a constitutional right would have been violated on the facts alleged" by the plaintiff. Saucier, 533 U.S. at 200. If so, the next question is whether the right asserted was clearly established at the time of the alleged violation. See id. The law is clearly established "not only when the very action in question has previously been held unlawful, but also when pre-existing law makes the unlawfulness of the act apparent." Meeker v. Edmundson, 415 F.3d 317, 323 (4th Cir. 2005) (internal quotation marks omitted).

On appeal, we review de novo the resolution of these questions by the district court.  See Rogers v. Pendleton, 249 F.3d 279, 285 (4th Cir. 2001).

The right the Estate alleges was violated here is Rodgers' Fourth Amendment right to be free of unreasonable seizures, a right that includes seizures accomplished by excessive force.  See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). The test for whether force employed to effect a seizure is excessive is one of "objective reasonableness under the circumstances."  Graham v. Connor, 490 U.S. 386, 399 (1989) (internal quotation marks omitted).

### A.   Excessive Force--Deputy Farrow

The Estate first contends that the district court erred in granting summary judgment to Deputy Farrow.  There is no dispute that while Deputy Farrow did fire his weapon, no bullets from that weapon struck Rodgers.  Based on this, the district court concluded that Deputy Farrow had not seized Rodgers within the meaning of the Fourth Amendment.  The Estate disputes this conclusion, maintaining that it is sufficient that Deputy Farrow intended to achieve Rodgers' submission through the use of force.  We disagree.

"From the time of the founding to the present, the word 'seizure' has meant a taking possession.  For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the animate or inanimate object in question, but

10

actually bringing it within physical control." California v. Hodari D., 499 U.S. 621, 624 (1991) (internal quotation marks & citations omitted; emphasis added). Thus, a seizure occurs only when there is a physical touching or a submission to a show of authority.[3] See id. at 625-26; United States v. Letsinger, 93 F.3d 140, 143 (4th Cir. 1996). Here, there was no seizure because the bullets from Deputy Farrow's weapon never touched Rodgers. See Carr v. Tatangelo, 338 F.3d 1259, 1267, 1270-71 (11th Cir. 2003) (noting that excessive force claim asserted by individual who was shot at by law enforcement officers, but not touched by bullets, did not involve Fourth Amendment seizure).

B. Excessive Force--Deployment of Police Dog

The Estate next contends that the district court erred in granting summary judgment on the Estate's claim that Officer Waters unreasonably deployed the police dog without first warning Rodgers. See Vathekan v. Prince George's County, 154 F.3d 173, 178 (4th Cir. 1998) ("An attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation.").

This court has twice addressed the constitutionality of the deployment of a police dog without prior warning. In Kopf v. Wing, 942 F.2d 265, 266 (4th Cir. 1991), law enforcement officers

---

[3]The Estate does not claim that Rodgers submitted to a show of authority by Deputy Farrow, or by any other officer.

deployed a police dog without prior warning on two suspects who were hiding in an "extremely narrow passage" between a shed and a fence and who were thought to be armed. This court concluded that the officer responsible for the deployment was not entitled to summary judgment on the basis of qualified immunity, reasoning that failure to provide a warning and time for the suspects to surrender was unreasonable, given that they were surrounded and unable to escape. See id. at 268. In Vathekan, the facts viewed in the light most favorable to the plaintiff indicated that a law enforcement officer deployed a police dog, without prior warning, into a residence that he believed had been broken into. See Vathekan, 154 F.3d at 176-77. This court concluded that doing so was unreasonable, see id. at 180, and noted that "Fourth Circuit precedent existing in 1995 clearly established that failure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context," id. at 179.

Citing Kopf and Vathekan, the Estate contends that deployment of a police dog without a verbal warning is always objectively unreasonable. This cannot be so, however. As noted in Vathekan itself, a Fourth Amendment excessive force claim is evaluated under the reasonableness standard set forth in Graham. See Vathekan, 154 F.3d at 178; see also Kopf, 942 F.2d at 267-68 (quoting Graham). The application of this test "requires careful attention to the facts and circumstances of each particular case, including the

12

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97. Thus, Vathekan cannot be viewed as holding anything more than that the unwarned deployment at issue in that case was unreasonable.

Applying this test to the particular facts that faced Officer Waters when he deployed the police dog without first warning Rodgers, we conclude that there was no Fourth Amendment violation. When Officer Waters deployed the police dog, he had heard Officer Brown shout "Gun!", and he observed that Rodgers' right hand was out of view under his shirt.[4] These observations were combined with Officer Waters' knowledge that Rodgers had kidnapped his

---

[4]Citing Freeman's statement to the police and her deposition testimony, the Estate asserts that there is "compelling evidence that the unarmed ... Rodgers had his hands in the air when he was viciously attacked by the K-9 Officer." Br. of Appellants at 27. As set forth in Part I.A., however, Freeman's statement and deposition testimony establish that she viewed Rodgers' hands only for a brief period as he began to emerge from his vehicle. The uncontradicted testimony of officers outside the vehicle--who observed Rodgers when Freeman could not--and what can be seen on the videotape indicate that Rodgers' hands were not raised in surrender when the police dog was deployed.

13

girlfriend at gunpoint, had led police on a high-speed chase, and had stopped abruptly in a manner that caused Officer Waters' vehicle to collide with Rodgers' vehicle. At the time of the deployment, Officer Waters was no more than 10 feet away from Rodgers. Officer Waters testified during his deposition that he deployed the dog without warning because "I was close and there was no cover between [Rodgers] and I. And I didn't want to draw any more attention to myself than I had to." J.A. 285. Under these circumstances, we cannot say that Officer Waters' judgment was an unreasonable one. We therefore conclude that there was no Fourth Amendment violation in the manner Officer Waters deployed the police dog.

Even if Officer Waters' deployment of the police dog without prior warning did violate the Fourth Amendment, the unlawfulness of his conduct was not clearly established on April 15, 2002. Kopf and Vathekan stand at most for the principle that the Fourth Amendment is violated when an officer who faces no immediate threat deploys a police dog without prior warning. For the reasons set forth above, that was not the case here.

### C. Excessive Force--Shooting

The Estate next contends that Officer Waters used excessive force in shooting Rodgers. "The intrusiveness of a seizure by means of deadly force is unmatched." Tennessee v. Garner, 471 U.S. 1, 9 (1985). Nevertheless, a police officer may employ deadly

14

force when the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. at 11; see Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001).

The record evidence, viewed in the light most favorable to the Estate, supports the conclusion that when Rodgers initially emerged from his vehicle, his hands were up, and they were empty. This much can be reasonably inferred from Freeman's testimony and from the testimony of Officer Brown. We will therefore assume that at that point, the use of deadly force would have violated the Fourth Amendment. However, no deadly force was used then. Rather, the uncontradicted record evidence establishes that at some point after initially emerging from the car, Rodgers acquired his firearm, either by reaching back into the car and grabbing it (as Officer Brown's testimony would indicate), or by some other means (such as removing it from the waistband of his pants, an inference consistent with Freeman's testimony). Further, the uncontradicted record evidence indicates that Officer Brown shouted "Gun!" and, critically, that Rodgers waved the weapon around and pointed it directly at Officer Waters and Deputy Farrow. Indeed, Officer Waters testified that he saw Rodgers point the firearm at him after Rodgers had been engaged by the police dog. When Officer Waters was presented with these circumstances, he also knew that Rodgers had abducted his estranged girlfriend at gunpoint, had led officers

15

on a lengthy high-speed chase, and had caused one of the pursuing vehicles to crash into his own. We therefore hold that Officer Waters' use of deadly force was not objectively unreasonable in light of the circumstances known to him at the time of the shooting.

The Estate further contends, however, that even if the use of deadly force was justified when Officer Waters fired the initial shots, that justification ended when Rodgers fell to the ground. We disagree. The reasonableness of an officer's actions rests on the information possessed by the officer at the moment that force is employed. See Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996). Therefore, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2004); see Hopkins v. Andaya, 958 F.2d 881, 887 (9th Cir. 1992) (per curiam) (holding that second use of deadly force was unreasonable when "the exigency of the situation lessened dramatically" after the first use of deadly force).

In Elliott, we assessed the reasonableness of the use of deadly force by police officers who had placed a suspect, with his hands cuffed behind his back, in a police cruiser. See Elliott, 99 F.3d at 641-42. Moments later, the officers observed the suspect pointing a firearm at them, and they fired 22 shots in a matter of seconds, killing the suspect. See id. at 642. We rejected the

16

contention that the number of shots fired rendered the use of force excessive, noting that the shooting took place in a matter of seconds.  See id. at 643.  "That multiple shots were fired does not suggest the officers shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat."  Id.  In contrast, in Waterman we considered a situation in which officers fired at a suspect as he accelerated his vehicle toward and then past them.  See Waterman, 393 F.3d at 474-75.  We held that officers exceeded constitutional bounds by continuing to fire after the vehicle passed them, at which point the officers knew or should have known that the immediate threat of harm had passed.  See id. at 482.

We conclude that Elliott is controlling here.  The videotape establishes that Rodgers fell to the ground, with his arms in the vicinity of his waist, no later than 1:51:08.  At this time, Rodgers appears to be slightly curled up, thus presenting the top or back of his head to Officer Waters.  Only two seconds later, at 1:51:10, Officer Waters fires three more shots.  Importantly, although Rodgers' firearm left his hands as he fell, nothing in the record indicates that Officer Waters knew that Rodgers had dropped his weapon, and thus was no longer a threat.  We conclude that on this evidence, a reasonable factfinder could only conclude that Officer Waters was acting to ensure the neutralization of a deadly threat.

17

Even if the second volley of shots were unconstitutional, that unconstitutionality was by no means clearly established as of April 15, 2002. Waterman required us to decide whether it was clearly established in November 2000 that an officer may not use deadly force in the seconds after a serious threat had abated. See Waterman, 393 F.3d at 482-83. We concluded that although other circuits had reached this conclusion prior to the relevant time, the Fourth Circuit had not. See id. at 483. In light of the uncertainty of the law existing at the time of the incident, we held that the unconstitutionality of the use of force in the seconds after a threat has abated was not clearly established. See id. Because the law on this point did not become clear until 2004, when Waterman was decided, we conclude that even if Officer Waters had violated the Constitution, he would be entitled to qualified immunity on the basis that the unconstitutionality of his actions was not clearly established at the time of the incident.[5]

---

[5]In light of our conclusion that all of the officers involved in the incident are entitled to qualified immunity, the Estate's claims against Martin County Sheriff Keith Roach and against the City of Williamston necessarily fail. See Kopf, 942 F.2d at 269 (noting that municipal liability "is derivative of, but narrower than, the officers'").

18

III.

This case is no doubt a tragic one. It is possible, as the Estate contends, that Rodgers was attempting to surrender when he was engaged by the police dog and shot at by the officers. Even if this was the case, however, the circumstances presented to the officers at the outset of the encounter--the kidnapping, the high-speed chase, the wielding of a firearm and pointing it at the officers--gave them probable cause to believe otherwise, and to use deadly force to eliminate a serious and immediate threat to their lives. We therefore affirm the district court.

AFFIRMED

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusion that Deputy Farrow did not seize Rodgers within the meaning of the Fourth Amendment. Accordingly, I concur that this officer is entitled to qualified immunity. However, because I cannot conclude as a matter of law that Officer Waters' deployment of his police dog was objectively reasonable under the circumstances, I dissent from the majority's holding that this defendant is also entitled to qualified immunity.

"An attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment violation." Vathekan v. Prince George's County, 154 F.3d 173, 178 (4th Cir. 1998). As the majority recognizes, this court has twice addressed the issue of whether releasing a police dog without issuing a prior warning constituted unreasonable deployment. See id.; Kopf v. Wing, 942 F.2d 265 (4th Cir. 1991). In both cases, this court concluded that it did. In this case, it is undisputed that Officer Waters deployed his police dog against the decedent without issuing a prior warning. The majority, however, distinguishes the circumstances faced by Officer Waters in this case from those faced by the officers in Vathekan and Kopf, apparently on the grounds that Waters, unlike the officers in those cases, faced an imminent threat of harm. See Op. at 14-15. Accordingly, the majority concludes that it was not unreasonable for Waters to deploy his dog without prior warning. In my view, however, Waters did not face an

imminent threat from Rodgers, and, thus, I cannot meaningfully distinguish the circumstances of this case from those of Kopf.

Although the majority provides a brief summary of the facts of Kopf, I believe that a more complete recitation is required. After receiving a radio report of an armed robbery, police officers initiated a high-speed pursuit of the vehicle in which the suspects were riding. Kopf, 942 F.2d at 266. Shortly thereafter, the suspects abruptly stopped their car and fled on foot. Id. After a cursory search of the vehicle failed to uncover the handgun used in the robbery, the officers reasonably concluded that the suspects likely were armed. Id. Although officers apprehended one of the three suspects during the ensuing foot pursuit, two suspects were able to conceal themselves behind a shed in the backyard of a residential neighborhood. Id. The suspects' hiding place "was an extremely narrow passage between the shed's wall and a fence." Id. After the officers located these defendants and surrounded the shed, one officer deployed a police dog into the passageway without a forewarning. Before the officers entered the passageway, the police dog severely mauled the suspects. See id. at 267.

In reviewing the propriety of the district court's grant of summary judgment in favor of the officer who had deployed the dog, this court concluded that he was not entitled to qualified immunity. Notwithstanding the officer's reasonable belief that the suspects were armed, the court concluded that the officer's failure

21

to provide a warning (and therefore an opportunity to surrender) before deploying the dog was unreasonable.  See id. at 268.  As the majority recognizes, central to this conclusion was this court's finding that the suspects were surrounded and unable to escape.  See id.

The majority relies on Officer Waters' knowledge of the circumstances leading up to the high speed pursuit as well as his statements regarding his perceptions of Rodgers once that pursuit ended to conclude that Waters acted reasonably in deploying his police dog without warning.  However, the evidence in the record, when viewed in the light most favorable to the decedent, portrays a scene indistinguishable from the one faced by the officers in Kopf.

The video of this incident indicates that several officers had positioned themselves around the parking lot before Rodgers exited his vehicle.  Thus, as in Kopf, the decedent was surrounded and unable to escape.  However, the majority concludes that Waters, unlike the officers in Kopf, faced an imminent threat of harm.  In so doing, the majority points to Waters' assertions that he heard someone yell "Gun!", that he observed that Rodgers' right hand was out of view under his shirt, and that he (Waters) was so close to the decedent that he had no choice but to deploy his dog without warning.  See Op. at 14-15.  Viewing the evidence in the light most

favorable to the decedent, however, I believe that the majority's reliance on these assertions is misguided.

First, as the majority notes, Officer Waters gave two distinctly different versions of what he saw in Rodgers' hand before he deployed the dog. In his initial SBI statement taken shortly after the shooting, Waters asserted that he did not see Rodgers' right hand, but that "it may have been up under his shirt." J.A. 345. Contrarily, in a sworn affidavit, Waters later claimed that Rodgers had "advanced toward [him] with his handgun drawn in a threatening manner." J.A. 135. The patent inconsistency between these two statements undermines the credibility of Waters' assertions as to the imminent threat posed by the decedent.

Second, Officer Waters' and the other officers' actions, as portrayed on the video, provide strong evidence that Rodgers did not have a gun in his hand prior to being engaged by the dog. Beginning at 1:51:01, Officer Waters, without drawing his gun, can be seen rushing across the parking lot to within a few feet of where Rodgers is standing, hurling the dog towards him, and then continuing to advance until he is within inches of Rodgers. Four seconds later, at 1:51:05, Officer Waters, who is now standing in front of Rodgers watching the dog attack, begins to back away from Rodgers (and the dog). Officer Waters does not draw his gun until 1:51:06, when Rodgers, who at this point is desperately attempting

23

to extricate the dog from his leg, reaches towards his waistband. Had Waters actually heard his fellow officer shout "Gun!" or turned around to see Rodgers pointing a weapon at him, as he later claimed, it is doubtful that the officer would have approached and stood in front of Rodgers in such a vulnerable manner. Further, the video shows that neither Officer McFarlane or Deputy Farrow has his gun raised at Rodgers as Officer Waters rushes towards him with the dog. Officer McFarlane, who is crouched on the ground with his gun in his right hand, does not raise his weapon at Rodgers until Waters releases the dog (1:51:03), and Deputy Farrow does not draw and aim his gun at Rodgers until five seconds after McFarlane (1:51:08). This is further evidence that Rodgers did not have a gun in his hand prior to Waters' release of the dog.

Finally, Waters' contention that he was so close to Rodgers that he had no choice but to deploy the dog without warning is belied by his actions and previous statement. As noted above, the video shows Waters advancing across the parking lot to within two or three feet of Rodgers <u>before</u> <u>releasing</u> the dog. Further, Waters initially asserted in his SBI statement that, while the high speed pursuit was still in progress, he had radioed the other officers to warn them that he intended to deploy the dog against Rodgers once the pursuit ended. <u>See</u> J.A. 344. This statement further undermines Waters' claim that he made a split-second decision to deploy the dog based on his close proximity to Rodgers.

24

In sum, the video portrays a scene where a police officer deployed his dog without warning against a suspect who was completely surrounded and who, as evidenced by the officers' own actions, had not drawn his gun or otherwise endangered his--or his fellow officers'--safety. I, therefore, conclude that Officer Waters' deployment of the dog in this case is not readily distinguishable from the unlawful deployment in <u>Kopf</u> and would hold that Waters is not entitled to qualified immunity.[*]

As the majority aptly notes, this is a tragic case. I, however, cannot join the majority in concluding that Rodgers' actions in bringing about this encounter justified Officer Waters' subsequent response. Ultimately, viewing the evidence in the light most favorable to the decedent, I believe a jury could conclude that Rodgers got out of his vehicle with empty hands in an attempt to surrender. Although it is undisputed that Rodgers eventually drew a gun, a jury could reasonably find that he did so only after he was attacked by the dog--and only then, in a desperate attempt to defend that attack. But for Officer Waters' unwarned deployment of the dog, this tragedy may have been averted.

I respectfully dissent in part.

---

[*]The unlawfulness of deploying a dog without prior warning in these circumstances was clearly established by our decision in <u>Kopf</u>, which this court decided eleven years before the events giving rise to this case occurred. Thus, I would also conclude that the decedent has satisfied the second element for defeating qualified immunity as to Officer Waters.