**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1877**

STEPHEN S. KREIN,

              Plaintiff - Appellee,

        v.

TROOPER L. W. PRICE, individually and in his official
capacity,

              Defendant – Appellant,

        and

WEST VIRGINIA STATE POLICE; TROOPER W. S. SNYDER,
individually and in his official capacity,

              Defendants.

Appeal from the United States District Court for the Southern
District of West Virginia, at Charleston.  John T. Copenhaver,
Jr., District Judge.  (2:11-cv-00962)

Argued:  September 17, 2014          Decided:  December 19, 2014

Before KING and FLOYD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by unpublished per curiam opinion.  Senior Judge
Hamilton wrote a dissenting opinion.

**ARGUED:** Michael Deering Mullins, STEPTOE & JOHNSON, PLLC,
Charleston, West Virginia, for Appellant.  Richelle Keener

Garlow, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Robert L. Bailey, II, STEPTOE & JOHNSON, PLLC, Charleston, West Virginia, for Appellant.  Michael Thane Clifford, LAW OFFICE OF MICHAEL T. CLIFFORD, Charleston, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this 42 U.S.C. § 1983 action, we consider whether a police officer who used deadly force is entitled to qualified immunity. In December 2008, two West Virginia State Police troopers, W.S. Snyder and appellant L.W. Price, blocked appellee Stephen Krein's vehicle at a gas station in Roane County, West Virginia. When Krein pulled forward in an attempt to evade the troopers, Price fired twice at Krein's vehicle, striking him in the head and leaving him permanently disabled.

In December 2010, Krein sued Price, Snyder, and the State Police in West Virginia state court, alleging, inter alia, violations of his civil rights under § 1983. After the defendants removed the case to federal court, the district court denied the defendants' motion for summary judgment, finding that several disputed issues of material fact precluded judgment as a matter of law on their qualified immunity defense.

As explained below, we find that sufficient evidence exists for a factfinder to determine that Price's second shot was objectively unreasonable and thus constituted "excessive force" prohibited by the Fourth Amendment. We also conclude that the Fourth Amendment's prohibition on excessive force in this circumstance was a "clearly established" constitutional right, and that Price, as a West Virginia trooper, was charged with

3

notice of this clearly established constitutional right. Accordingly, we affirm.

I.

A.

W.S. Snyder and appellant L.W. Price are troopers of the West Virginia State Police. On December 1, 2009, they set out to serve arrest warrants on appellee Stephen S. Krein. The warrants stemmed from an incident occurring a week earlier when two other officers attempted to arrest Krein for misdemeanor domestic violence. That time, Krein successfully fled and almost drove into one of the officers.

Price and Snyder located Krein's white Chevrolet truck at a gas station in Roane County, West Virginia. Although witnesses[1] disagree about the relative positions of the vehicles and individuals during the confrontation, witness testimony supports the following: Krein's truck was backed into a parking space and faced the adjoining road. Facing the same direction, a maroon car was parked ten feet to the left of the truck. At least one set of fuel pumps was located ten feet to the right of the

_____

[1] Krein, who was seriously injured in the incident, does not remember the confrontation at the gas station. The following sequence of events stems from the statements of Price, Snyder, and two witnesses—Billy James Jett and Richard McKinney—who were waiting in the parking lot to pick up their wives from work.

4

truck, and another set of pumps was located either next to Krein's truck or behind it.

When the officers arrived at the store, Krein was pulling forward in his truck. To prevent Krein from escaping, Price positioned his cruiser at an angle in front of Krein's truck, with the cruiser's passenger-side door facing the truck. Krein then backed up, hitting a fuel pump. Price and Snyder exited the cruiser. Price left the passenger-side door open. Krein pulled forward and bumped the passenger-side door of the cruiser with enough force to close it. Krein then "backed up and . . . cut[] his wheel to come out in between a small opening [between the cruiser and the maroon car]. He was trying to get out." J.A. 43. Both Price and Snyder drew their service weapons and repeatedly told Krein to stop and exit the vehicle. Snyder was standing near the truck's driver-side door and close to the maroon car. Price walked in front of the truck and stood between the truck and the cruiser.

When Krein drove forward toward Price, Price fired a shot that either hit the truck's grill or went under the truck. Krein then ducked inside the truck, turned the steering wheel, and accelerated toward Snyder. Snyder moved toward the maroon car to get out of Krein's way, and Price "stepped off to the side." J.A. 53. Both Price and Snyder stated that Price was trapped. See J.A. 45 ("I tried the best to get out of the way

5

because I didn't have anywhere to go."); J.A. 52 ("[I]t was kind of like a triangle shape and . . . Trooper Price was wedged in the center of it, didn't have no way to escape."). A witness claims, however, that Price got out of harm's way when he stepped to the side. See J.A. 60 ("Mr. Krein would have hit the trooper with his truck if the trooper had not taken a quick step to his right[.]"). Price then fired a second shot, which went through the truck's passenger-side window and struck Krein in the head. The entire encounter lasted approximately one minute.

After Price shot Krein, the truck coasted through the gap between the maroon car and cruiser and stopped in the road. A witness called 911 and said, "Two state troopers, a truck tried to run over them there and they had to fire shots." J.A. 71. He also said that the troopers "fired shots when [Krein] was pulling around them." Id. Price and Snyder removed Krein from the truck and administered first aid until the paramedics arrived. Krein survived the gunshot wound to his head, but due to his injury, he cannot walk, speak properly, or care for himself.

B.

In December 2010, Krein sued Price and Snyder (individually and in their official capacities) and the West Virginia State Police (collectively, "Defendants") in state court. The

6

Defendants removed the action to federal court. After the district court ruled on a motion to dismiss, five claims remained, including a 42 U.S.C. § 1983 claim alleging that Price used excessive force in violation of the Fourth Amendment. In January 2013, the State Police and Price moved for summary judgment. As to the § 1983 claim, the district court denied summary judgment because a reasonable factfinder could conclude that Price did not act reasonably when he used deadly force. According to the district court, the evidence demonstrates that Price may have shot Krein simply to prevent Krein's escape rather than to save Price's or another's life. Thus, the district court found that Price was not entitled to qualified immunity. Price appeals that determination.

## II.

### A.

This Circuit has jurisdiction to review a district court's denial of qualified immunity at summary judgment if the court's decision turned on an issue of law. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Cooper v. Sheehan, 735 F.3d 153, 157 (4th Cir. 2013). Qualified immunity acts as "an immunity from suit rather than a defense to liability." Mitchell, 462 U.S. at 526. "As a result, pretrial orders denying qualified immunity generally fall within the collateral order doctrine." Plumhoff

7

v. Rickard, 134 S. Ct. 2012, 2019 (2014) (citing Ashcroft v. Iqbal, 556 U.S. 662, 671-672 (2009)). Immunity—as a defense to prosecution in the first instance—is a separate issue from the merits and "could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." Id. (citations omitted).

B.

We review a district court's denial of summary judgment on qualified-immunity grounds de novo. Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992). In doing so, we view the evidence in the light most favorable to the nonmoving party, and can grant summary judgment only if there is no genuine issue of material fact. Iko v. Shreve, 535 F.3d 225, 230, 235 (4th Cir. 2008). Similarly, in reviewing a district court's denial of qualified immunity, we generally accept the facts as the district court found them, Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc), though we must also view them in the light most favorable to the nonmoving party. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Price, as the public official asserting qualified immunity, bears the burden of proof. Meyers v. Balt. Cnty., 713 F.3d 723, 731 (4th Cir. 2013).

III.

Having concluded that we have jurisdiction, we turn to Price's contention that qualified immunity shields him from Krein's § 1983 claim.

A.

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

To receive qualified immunity, Price must prove either (1) that his conduct did not violate the constitutional right at issue (here, the Fourth Amendment's prohibition on excessive force) or (2) that the right was not "clearly established" at the time of the incident. Id. at 232, 236. For purposes of summary judgment, Price cannot satisfy either prong.

9

B.

Price contends that he satisfies the first prong because his conduct did not constitute excessive force prohibited by the Fourth Amendment. In support, Price argues that the district court improperly considered his subjective intent in shooting Krein. Although Price correctly notes that his subjective intent is irrelevant to the Fourth Amendment analysis for objective reasonableness, there is sufficient evidence in the record for a reasonable factfinder to conclude that Price's second shot—fired from the side of Krein's vehicle—was excessive.

The Fourth Amendment protects "people . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This prohibition "includes the right to be free of 'seizures effectuated by excessive force.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)). Courts analyze whether an officer used excessive force using an "objective reasonableness" test. Id. (citing Scott v. Harris, 550 U.S. 372, 381 (2007)). Under this standard, a court considers officers' behavior "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Indeed, "[a]n officer's evil intentions will not make a Fourth Amendment

10

violation out of an objectively reasonable use of force." Graham, 490 U.S. at 397.

An officer acts unreasonably if he or she "shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Henry, 652 F.3d at 531-32 (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)). This assessment occurs at the moment that force is used. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996).

Therefore, we must ask whether the facts—viewed in the light most favorable to Krein—demonstrate that Krein posed a serious threat to Price, Snyder, or the other individuals present at the scene when Price fired the second shot.[2]

Based on our review of the record, a reasonable factfinder could conclude that Krein no longer posed a serious threat to the troopers at the time that Price fired his second shot. Admittedly, the record contains conflicting information regarding whether Price and Snyder were at risk of being struck when Price fired the second shot. Price and Snyder testified that Price was still in danger when he fired the second shot. Price explained that he "tried the best to get out of the way

---

[2] Price's second shot is the only one at issue in this case. The parties do not dispute whether Price's first shot was objectively reasonable.

11

because [he] didn't have anywhere to go" and that he "felt [his] life was threatened." J.A. 45, 47. He also explained that Krein "could possibly have cut a hard left but then Trooper Snyder's life would have been in danger." Id. at 47-48. Trooper Snyder said that Price "had no way to escape" and that "if [Krein] had come forward any more . . . Trooper Price would have been pinned between the vehicle and his truck." Id. at 52, 57. Jett and McKinney, the two bystanders, similarly believed that Price was in serious danger. Id. at 61 (Jett); Id. at 66 (McKinney).

But at the summary judgment stage, we must view the facts in the light most favorable to Krein. Waterman v. Batton, 393 F.3d 471, 473 (4th Cir. 2005). Taken in that light, the record contains numerous indications that Price and Snyder would have been able to escape Krein's truck without Price firing the second shot.[3] Most importantly, Price's second shot entered

---

[3] As Price notes, the district court made repeated references to Price's motivations in firing on Krein, stating that "Trooper Price's admission that Krein had previously escaped his custody should suggest that a desire to prevent a similar escape rather than the fear of harm motivated Trooper Price's actions." J.A. 84. Price's motivation, in the district court's view, precluded qualified immunity: "If, as Krein appears to suggest, Trooper Price fired the second shot not out of fear for his or Trooper Snyder's safety or concern that Krein might present a threat to another, but merely to thwart Krein's escape, granting qualified immunity would be improper." Id. at 89. Although the district court may have improperly considered Price's subjective intent, any such error is irrelevant because we review the district court's denial of qualified immunity de novo. Pritchett, 973 F.2d at 313.

through the passenger side window of Krein's truck, strongly suggesting that Price was not in front of the truck when he fired on Krein the second time. Multiple statements also indicate that Price and Snyder were not in danger when Price fired the second time. Price explained that he "got out of the way" when he fired the second shot. J.A. 45. Snyder said he "went down the side of the vehicle that was parked beside Mr. Krein to get away from him." Id. at 52. He also said that Price was "at like a 45 degree angle off" from Krein's truck when Price fired the second time. Id. at 55. Jett, one of the bystanders, said that "Mr. Krein would have hit the trooper with his truck if the trooper had not taken a quick step to the right." Id. at 60. When Jett called 911, he stated, "[t]wo state troopers, a truck tried to run over them there and they had to fire shots" but also stated that the troopers "fired shots when [Krein] was pulling around then." Id. at Ex. A. McKinney said that Price "jumped back out of the way." Id. at 66.

It is true that "[t]he calculus of reasonableness must embody allowances for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001) (quoting Graham, 490 U.S. at 396-97). But even allowing Price some leeway to account for the

13

tense, hurried nature of the incident cannot change the fact that the record contains numerous indications that a reasonable officer would have realized that deadly force was not necessary to protect himself or others when he was no longer in the direction of Krein's vehicle. Accordingly, viewing the facts in the light most reasonable to Krein, a reasonable fact-finder could conclude that Price acted unreasonably when he shot Krein.

C.

Price also cannot satisfy the second prong of the qualified immunity test because the constitutional right that Price violated was "clearly established." Harlow, 457 U.S. at 818-19. The right at issue here is the right to be "free from unreasonable seizures, a right which includes seizures accomplished by excessive force." Waterman, 393 F.3d at 475. "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083-84 (2011)). Although courts should not "define clearly established law at a high level of generality," al-Kidd, 131 S. Ct. at 2084, this Court need not determine that the "very action in question has previously been held unlawful," Doe ex

14

rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 176 (4th Cir. 2010) (citation omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Our decision in Waterman v. Batton demonstrates that the right Price allegedly violated is clearly established. 393 F.3d at 483; see also Estate of Rodgers ex rel. Rodgers v. Smith, 188 F. App'x 175, 183-184 (4th Cir. 2006) (determining that the law established in Waterman was clear). In that case, a police officer attempted to initiate a traffic stop of Waterman for speeding, but Waterman refused. 393 F.3d at 473. Officers then pursued Waterman. Id. One officer reported that Waterman tried to run him off the road. Id. at 474. When Waterman reached a toll plaza, five uniformed officers stood in front of his vehicle, "only a few feet to the passenger side of the vehicle's projected path." Id. at 474-75. Waterman coasted at about 11 miles per hour and then began "lurching or lunging forward" as he began to accelerate toward the toll plaza and the officers. Id. at 474 (internal quotation marks omitted). The officers shot at the vehicle, which avoided them by several feet as it passed. Id. at 475. The officers continued to fire on Waterman as he drove away. Id. Waterman sustained five gunshot wounds and died from his injuries. Id.

15

As we explained, "the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." Id. at 481 (emphasis added). Based on that principle, we concluded that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Id. We distinguished when Waterman's car was passing the officers—finding that they reasonably feared for their safety at that point—from when Waterman's car had passed them—finding that the danger had also passed. Id. at 482. The shots fired at Waterman after he had passed the officers in his car constituted excessive force. Id. At that point, the officers and bystanders were not endangered by Waterman's vehicle. Id.

A similar distinction between two sets of gunshots can be made here. Like the officers in Waterman, Price was in danger when he fired the first shot because he was directly in front of the vehicle. But just seconds later, he was on the passenger side of the vehicle and thus was no longer in danger of being hit. The other officer, Snyder, was similarly not threatened when Price fired the second time. As our decision in Waterman demonstrates, these types of fine distinctions must be made to give proper effect to the Fourth Amendment's prohibition on excessive force.

16

Indeed, the overall circumstances in this case were less dangerous than in Waterman. There, the officers fired at Waterman in the context of a high-speed chase. Here, however, Krein's vehicle was effectively trapped by the troopers' vehicle and Krein was not driving at a high speed. Viewing the evidence in the light most favorable to Krein, Price and Snyder were not at serious risk of being struck by Krein's vehicle when Price fired the second shot. As such, Price's second shot violated the clearly established law this Circuit set out in Waterman.

IV.

For the foregoing reasons, the district court's order denying Price's motion for summary judgment is

AFFIRMED.

17

HAMILTON, Senior Circuit Judge, dissenting:

In conducting its own de novo review of the record, the majority holds that Trooper Price acted unreasonably when he fired the second shot that injured Krein.[*] With all due respect to the majority, in my view, Trooper Price reasonably believed that Krein posed a serious threat of physical injury to both himself and Trooper Snyder at the time he fired the second shot. Accordingly, I dissent from the majority's denial of qualified immunity to Trooper Price.

A police officer acts unreasonably if he "shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Henry v. Purnell, 652 F.3d 524, 531-32 (4th Cir. 2011) (en banc) (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)). Thus, as recognized in Henry, we must analyze whether Krein posed a serious threat of physical injury

---

[*] The majority understandably does not uphold the flawed analysis of the district court, which denied qualified immunity principally on the basis that Trooper Price shot Krein because he wanted to prevent him from escaping. As noted by the majority, ante at 12 n.3, Trooper Price's subjective motivation in firing the second shot is irrelevant to the qualified immunity analysis. See also Graham v. Connor, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

to Trooper Price, Trooper Snyder, or the others on the scene when Trooper Price fired the second shot.  Id.  Whether the force used was reasonable is determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396; see also Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) (noting that "the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed").

Importantly, in analyzing the reasonableness of a police officer's actions, we must make "allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 397.  We make such allowance because the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also United States v. Phillips, 588 F.3d 218, 227 (4th Cir. 2009) (noting that reasonableness "does not, by definition, entail perfection"); Anderson v. Russell, 247 F.3d 125, 132 (4th Cir. 2001) (noting that the Fourth Amendment "'does not require omniscience'" and that police

19

officers "'need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm'" before using force) (quoting Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996)); Milstead v. Kibler, 243 F.3d 157, 165 (4th Cir. 2001) (noting that "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment").

The majority concludes that Trooper Price acted unreasonably because "the record contains numerous indications that Price and Snyder would have been able to escape Krein's truck without Price firing the second shot." Ante at 12. But the dispositive question is not whether the troopers would have been able to escape without Trooper Price firing the second shot, but rather whether Trooper Price, based on the information he possessed, was reasonable in believing that he, Trooper Snyder, and/or the others on the scene were in danger of serious physical injury when he fired the second shot. While the majority's analytical framework may address the question of whether Trooper Price, Trooper Snyder, and the others on the scene were, as a matter of fact, out of danger at the time the second shot was fired, it does not address the outcome determinative question of whether Trooper Price reasonably believed a serious threat of physical injury was present.

20

For obvious reasons, the majority consciously avoids the proper analytical inquiry. The majority does not want to address whether Trooper Price was reasonable in believing that he, Trooper Snyder, and/or the others on the scene were in danger when he fired the second shot. After all, it is hard to criticize a police officer for shooting at a driver who tries to run him over and then fires a second shot when the driver accelerates toward a fellow officer. Moreover, the majority's analytical tack allows it to avoid explaining exactly what allowances it is making for Trooper Price, who was confronted with rapidly developing circumstances in which both he and his partner were in peril. Finally, the majority's chosen analytical path allows it to avoid addressing how Trooper Price knowingly "violate[d] the law" or was "plainly incompetent" under the circumstances. Hunter, 502 U.S. at 229 (citation and internal quotation marks omitted).

A careful review of the record under the correct legal standard demonstrates that Trooper Price was reasonable in his belief that there was a threat of serious physical injury at the time he fired the second shot. Krein was a violent fugitive who yet again was trying to evade capture. Upon arriving, the troopers exited the police cruiser, which was parked at an angle directly in front of Krein's truck, and repeatedly ordered Krein to "stop" and "get out" of his truck. (J.A. 43). Rather than

21

complying with the troopers' commands, Krein attempted to flee. He backed up his truck, striking some fuel pumps, and then drove forward and struck the police cruiser. He backed up his truck again, cutting the wheel so that he could escape through the small area between the police cruiser and the maroon car. At this point, Trooper Price positioned himself directly in front of Krein's truck. Both Trooper Price and Trooper Snyder continued to order Krein to stop. Undeterred, Krein drove directly at Trooper Price, who fired the first shot that either hit the truck's grill or went under the truck. After the first shot, Krein turned the truck's wheel to his left and accelerated toward Trooper Snyder. Trooper Price moved to his left, "try[ing his] best to get out of the way." (J.A. 45). From all accounts, Trooper Price was in a wedge between Krein's truck, the police cruiser, and some fuel pumps. As he was trying to get out of the way, Trooper Price fired the second shot, which entered the front passenger window.

Based on the undisputed evidence recited above, it is self-evident that Trooper Price was reasonable in his belief that Krein presented a serious threat of physical injury to both he and to Trooper Snyder. After the first shot was fired, Krein accelerated toward Trooper Snyder. This created a serious threat of physical injury to Trooper Snyder, which Trooper Price understandably tried to thwart. Moreover, as Trooper Price was

22

trying to get out of the way when he fired the second shot, he was reasonable in believing that he was still in peril, especially considering the tight quarters he was confined to.

The reasonableness of Trooper Price's actions is confirmed by our decision in Waterman. In that case, police officers first fired their weapons at a car that "lurched" toward them, although the police officers were not directly in the path of the car and indeed would only have been hit if the car had swerved. 393 F.3d at 477. The car had been involved in a high speed chase. Id. In finding the first shooting justified, we focused on a number of factors, including the previous hazardous activity of the car. Id. But central to our analysis concerning the first shots was the limited time the police officers had to respond and "the closeness of the officers to the projected path of [the] vehicle." Id. at 479. These factors led us to conclude that the police officers were justified in using deadly force for the first shots. Id. at 481.

We found, however, that the police officers were not justified in firing their weapons at the car after it had passed them and stopped. Id. This finding was based on our observation that, after the car had passed the police officers, the police officers had access to new information regarding the perceived threat and should therefore have changed their

23

response accordingly. Id. Notably, then, the later shots fired by the police officers were found unjustified because the police officers could have actually perceived the passing of the threat. Id.

In this case, Trooper Price had just seconds to weigh everything before him. Krein was acting irrationally. He struck a police cruiser with his truck. He struck diesel fuel pumps in a lot with private citizens, including children, present. He ignored numerous commands from two state troopers pointing their guns at him by driving his truck at them, just like he previously had dangerously done to other police officers. "[T]he critical reality here" is that Trooper Price did not "have even a moment to pause and ponder" all the circumstances before him. Id. at 478. Indeed, unlike Waterman, the facts of this case simply do not support the conclusion that Trooper Price actually could have perceived the passing of the threat posed by Krein, especially since Krein was accelerating toward Trooper Snyder and, at the same time, Trooper Price was trying to move out of the way of the truck when he fired the second shot.

The majority's use of Waterman highlights once again its flawed analysis. It says Waterman is analogous to this case because Trooper Price "was no longer in danger of being hit" when he fired the second shot and because Trooper Snyder "was

24

similarly not threatened when Price fired the second time." Ante at 16. But, as noted above, the outcome determinative question is not whether the troopers were, in fact, out of danger at the time Trooper Price fired the second shot, but whether Trooper Price was reasonable in his belief that a serious threat of physical injury was present at the time he so fired.

Moreover, the majority's suggestion that the circumstances present in this case are less dangerous than the circumstances present in Waterman borders on the absurd. The majority says the circumstances present in Waterman are more dangerous because that case involved "a high-speed" chase whereas Krein was "effectively trapped" by the police cruiser. Ante at 17. This position does not withstand scrutiny. First off, Krein ultimately was successful in his attempt to maneuver the truck past the police cruiser and the maroon car, so Krein's truck was not effectively trapped. Second, while Waterman involved a high-speed chase, this distinction is inconsequential given the dangerousness created by Krein's escape-at-all-cost mentality. More compelling, though, is that, unlike Waterman, where none of the police officers were in the path of the car, Krein drove his truck directly at the troopers, placing them in immediate and concrete peril. Moreover, the plaintiff in Waterman had no prior criminal record, whereas Krein was a fugitive from justice

wanted for crimes involving domestic violence and assaulting police officers. Clearly, then, the circumstances present in this case are far more dangerous than those present in Waterman.

In the final analysis, the majority applies a standard that requires perfection on the part of Trooper Price. He had to know and be 100% correct in his knowledge that he, Trooper Snyder, and/or the others at the scene were in danger of being seriously injured when he fired the second shot to avoid being liable under § 1983. Such a standard is incompatible with Supreme Court, as well as this court's, precedent. "The Constitution simply does not require police [officers] to gamble with their lives in the face of a serious threat of harm." Elliott, 99 F.3d at 641. The upshot of all of this is that the majority is penalizing a police officer who attempted to do the right thing under the tense, uncertain, and rapidly-evolving dangerous circumstances with which he was confronted. Qualified immunity is designed to protect all but the plainly incompetent. Trooper Price is a far cry from this, and it is my hope that the ensuing trial will be resolved in his favor. It follows that I would vacate and remand with instructions to grant Trooper Price qualified immunity.