WILKINSON, Circuit Judge, dissenting:
 

 This dispute began when Herman Harris fled from Officer Zachary Pittman, after repeatedly being told to stop. Pittman caught up to Harris at the edge of a tree line and both men fell many feet down into the woods. In the ensuing struggle, the suspect fought off a taser and repeatedly struck Pittman. As Harris later admitted in a guilty plea for this assault, he tried to shoot Pittman in the head with Pittman's gun. Both men sustained serious injuries. When the altercation ended, Officer Pittman's face was lacerated, his hands were bleeding, taser wire covered the forest floor, and parts of Pittman's uniform and gun holster were destroyed. Harris was shot multiple times. Only a few minutes passed between the time that Officer Pittman first announced his presence and the time he emerged injured from the woods.
 

 The majority shaves this incident oh so fine, parsing and segmenting the encounter almost second by second, ultimately finding that Pittman's efforts to save his life in the final moments of the altercation were excessive. Sadly for the majority, the action here spun by; the struggle allowed the combatants no time for a coffee break. In the majority's view, if a suspect lands a punch in one moment, drags you to the ground the next, and goes for your gun a second later, a reasonable officer must shed any attempt to preserve his own life if, in the course of the ongoing fight, the officer gains so much as a fleeting advantage.
 

 It was much to be hoped that the majority would understand the difference between a struggle in which life and death hinged on an instant and the leisured contemplation brought to events years later. To the best of my knowledge, the majority was not present at the scene. The majority was not tumbling down a wooded ravine in the dark of night. The majority was not alone, fighting a person who had disregarded clear warnings, fled arrest, fought through a taser, and tried to grab its gun. The majority did not struggle to regain its weapon while lying beaten and bloodied on the ground. And the majority did not fear for its life when that weapon was ultimately used to stop the assault. The law of qualified immunity does not allow us to ignore the serious and ongoing threat faced by Officer Pittman. Although I may never understand the risks that officers face in the service of public safety, settled law requires that I try. Because I cannot see how Pittman's actions were in any way unreasonable, I respectfully dissent.
 

 I.
 

 My esteemed colleagues in the majority are surely right in one respect. Police officers do overreach. And when they do, the
 law must hold them to account. This court's decision in
 
 United States v. Slager
 
 , decided only a few months ago, makes it clear beyond question that police officers cannot apply force, and certainly not unreasonable force, in response to every provocation.
 
 912 F.3d 224
 
 , 237 (4th Cir. 2019). Officer Slager badly abused his authority by firing on a fleeing suspect and then lying about it afterwards. The law imposed its consequences. Qualified immunity, however, provides officers the "breathing room to make reasonable but mistaken judgments."
 
 Stanton v. Sims
 
 ,
 
 571 U.S. 3
 
 , 5,
 
 134 S.Ct. 3
 
 ,
 
 187 L.Ed.2d 341
 
 (2013) (quoting
 
 Ashcroft v. al-Kidd
 
 ,
 
 563 U.S. 731
 
 , 743,
 
 131 S.Ct. 2074
 
 ,
 
 179 L.Ed.2d 1149
 
 (2011) ). In other words, an officer may employ force in a fraught situation to forestall a deadly threat. That is all Officer Pittman did.
 

 Four years ago, the Supreme Court noted how often it is called upon to reverse federal courts that deny qualified immunity in excessive force cases: "Because of the importance of qualified immunity 'to society as a whole,' the Court often corrects lower courts when they wrongly subject individual officers to liability."
 
 City & Cty. of San Francisco v. Sheehan
 
 , --- U.S. ----,
 
 135 S. Ct. 1765
 
 , 1774 n.3,
 
 191 L.Ed.2d 856
 
 (2015) (collecting cases) (quoting
 
 Harlow v. Fitzgerald
 
 ,
 
 457 U.S. 800
 
 , 814,
 
 102 S.Ct. 2727
 
 ,
 
 73 L.Ed.2d 396
 
 (1982) ).
 

 The Court's view on the importance of qualified immunity has not wavered. Each year, it has continued to issue opinions, often per curiam, reversing a denial of qualified immunity in an excessive force suit.
 
 See, e.g.
 
 ,
 
 City of Escondido v. Emmons
 
 , --- U.S. ----,
 
 139 S. Ct. 500
 
 ,
 
 202 L.Ed.2d 455
 
 (2019) (per curiam);
 
 Kisela v. Hughes
 
 , --- U.S. ----,
 
 138 S. Ct. 1148
 
 ,
 
 200 L.Ed.2d 449
 
 (2018) (per curiam);
 
 White v. Pauly
 
 , --- U.S. ----,
 
 137 S. Ct. 548
 
 ,
 
 196 L.Ed.2d 463
 
 (2017) (per curiam);
 
 Mullenix v. Luna
 
 , --- U.S. ----,
 
 136 S. Ct. 305
 
 ,
 
 193 L.Ed.2d 255
 
 (2015) (per curiam). In some cases, lower courts erred by defining the constitutional right at such a high level of abstraction that no conduct whatsoever was protected by the immunity.
 
 See, e.g.,
 

 Mullenix
 
 ,
 
 136 S. Ct. at 308
 
 . At other times, courts have erred in applying the immunity standard, either by assessing the officer's conduct without regard to the facts on the ground,
 
 see, e.g.
 
 ,
 
 Kisela
 
 ,
 
 138 S. Ct. at 1153
 
 , or wrongfully finding a "genuine" dispute of fact,
 
 see, e.g.,
 

 Scott v. Harris
 
 ,
 
 550 U.S. 372
 
 ,
 
 127 S.Ct. 1769
 
 ,
 
 167 L.Ed.2d 686
 
 (2007). The Supreme Court has been forced into the fray to prevent the total erosion of qualified immunity.
 

 At some point a pattern of Court decisions becomes a drumbeat, leaving one to wonder how long it will take for the Court's message to break through. Perhaps the Court's patience on this point is endless, because, golly, it has been so sorely tried. The failings that have been so routinely documented by the Supreme Court rear their head once again. The majority has used the summary judgment standard once more to eviscerate qualified immunity protections. In the majority's hands, every dispute becomes genuine and every fact becomes material. Qualified immunity fades to the end of every discussion, its values reserved for lip service until little enough is left. The result? The majority has ignored Supreme Court precedent, somehow finding Pittman's actions to save his own life something our Constitution cannot condone.
 

 II.
 

 This case comes to us at the summary judgment stage and a suit can only proceed if some material fact is "genuinely" disputed. Although it may not be clear from reading the majority opinion, awards of pre-trial dismissals are crucial to the
 utility of any immunity. The Supreme Court has repeatedly emphasized that qualified immunity "is an
 
 immunity from suit
 
 rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."
 
 Mitchell v. Forsyth
 
 ,
 
 472 U.S. 511
 
 , 526,
 
 105 S.Ct. 2806
 
 ,
 
 86 L.Ed.2d 411
 
 (1985). If a case goes to trial when a valid basis for summary judgment exists, the entire purpose of the immunity is thwarted. The majority belies all of this teaching in repeatedly referring to this case as at an "early stage of the litigation," Maj. Op. at 271, thereby betraying its view that these sorts of cases should be resolved at a later, rather than earlier, point in time. But the more litigation the merrier is not at all what qualified immunity is about.
 

 The majority portrays this case as a one-on-one swearing contest between Harris and Pittman, but it is hardly that. My colleagues here are willing to rest their decision on a conclusory version of the facts offered by Harris, which is not only unsupported by the whole record, but flatly contradicted by it. Controlling precedent, however, simply does not allow the majority to turn a blind eye to the stark weaknesses in the plaintiff's claim. The requirement that there be a "genuine" dispute to get to trial should not be too high a barrier for plaintiffs, but it should not be an open door either. Harris has not done nearly enough to show a "genuine" dispute in this case, and his version of events should be rejected.
 

 Many of the facts offered by Officer Pittman are not disputed. Given that Harris offered very few facts of his own and previously pled guilty in state court to assaulting Officer Pittman, this is unsurprising. The parties agree that Harris fled after Pittman told him to stop, jumping a fence and ignoring multiple warnings. They also agree that the parties were engaged in a violent ground altercation, that there was a struggle for Pittman's gun, and that the first gunshot that struck Harris in the torso was fired in the course of the fight. Opening Br. at 3-4; Resp. Br. at 4-8. The majority acknowledges this broad agreement between the parties, which demonstrates beyond any doubt that Officer Pittman was involved in an incident that might well have taken his life. Maj. Op. at 268-69.
 

 The parties' accounts diverge on what happened in the final seconds of the fight, when the last shots were fired. Pittman alleges that he fired all of the shots in quick succession while Harris was standing over him, after telling him to get down. On his view, he was lying on the ground, physically exhausted and wounded, facing a suspect who was much larger than himself and who had just attempted to shoot him in the head with his own gun. We do not, of course, simply take Pittman's word for it. But Pittman's account of events not only comes from his own statement, but also has ample support in the record, including forensic evidence, witness statements, and photos taken at the crime scene. It is also consistent with the facts that Harris already accepted in his earlier state court plea. For his part, Harris alleges that Pittman fired on him once he fell to the ground, after he was already incapacitated by the earlier shot. Harris offers only his own affidavit to support his version of the facts.
 

 The Supreme Court's decision in
 
 Scott v. Harris
 
 tees up this case perfectly.
 
 550 U.S. 372
 
 ,
 
 127 S.Ct. 1769
 
 ,
 
 167 L.Ed.2d 686
 
 (2007). In
 
 Scott
 
 , the Court was also confronted by two wildly divergent accounts of the facts, one of which was provided by a plaintiff who offered no more than his own affidavit to support his claim. Even though the facts of the case were disputed at the summary judgment stage, the
 Court noted that what mattered was whether the dispute was "genuine," not merely contested. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."
 

 Id.
 

 at 380
 
 ,
 
 127 S.Ct. 1769
 
 .
 

 The majority abruptly dismisses
 
 Scott
 
 , terming it an "exception, not the rule." Maj. Op. at 276. But the Court in
 
 Scott
 
 had in mind an affidavit just like the one submitted by Harris, which offers little more than conclusory assertions and wild accusations. Harris at various times accuses the police (without support) of falsifying DNA evidence and lying about which officers were at the scene. J.A. 51, 57. He then asserts that he never grabbed Officer Pittman's gun and never initiated contact with him.
 
 Id.
 
 at 43. And most critically, he alleges that the final shots were fired long after he fell to the ground.
 
 Id.
 
 at 41-43.
 

 Harris's view may fit well with the prevailing social discourse, but it does not fit at all with the evidence. Unfortunately for my majority colleagues, who casually accept Harris's affidavit full stop, the record in this case undermines his story at nearly every turn. Harris's DNA was found on Pittman's weapon, belying any claim that he never grabbed the gun. J.A. 303-304. Forensic evidence demonstrates that the gunshot that injured Harris' hand was fired while the gun was holstered, further showing that he was grabbing for the weapon during the fight.
 
 Id.
 
 at 62, 252. Witnesses who heard the encounter recalled hearing a single shot, followed later by a series of shots fired in rapid succession.
 
 Id.
 
 at 59. This stands in stark contrast with Harris' contention that the second shot was followed by a long pause, such that Pittman would know for sure that Harris no longer posed a threat.
 

 As if this evidence from the scene were not enough, Harris, in the course of pleading guilty to assaulting Pittman, admitted in state court that he fought over the gun. In fact, he admitted trying to shoot Pittman in the head, and only failing because the gun misfired in the holster. J.A. 169. He also admitted in his plea proceedings to hearing "get down, get down" in the moments before the final shots, demonstrating that he was still standing at the time.
 
 Id.
 
 at 168. There is simply no way that a reasonable juror could look at an account so devoid of independent factual development, so full of unsupported accusations, and so weakened by blatant contradiction in the record and walk away with the sense that Harris's version of events is accurate, or in any way compelling.
 
 Scott
 
 recognizes that while the non-moving party's burden of showing a "genuine" dispute is not an onerous one, it cannot rest solely on such a flimsy foundation. Without additional support in the record, the decision in
 
 Scott
 
 requires that we adopt the version of events that is supported by objective record evidence.
 

 By this objective standard, taken not just from Pittman's account but from the record in its entirety, Pittman's actions were altogether reasonable. He fired on Harris while Harris was standing over him during an ongoing violent altercation. Moments earlier, his life was only spared by a misfiring gun. This court has never suggested that an officer is forbidden from taking action, including lethal action, to save his own life in such a situation. To the contrary, it is clearly established that he may do exactly that.
 
 See
 

 White
 
 ,
 
 137 S. Ct. at
 
 550 ;
 
 Elliott v. Leavitt
 
 ,
 
 99 F.3d 640
 
 , 642 (4th Cir. 1996).
 

 The majority finds otherwise only by looking to cases far afield from the facts actually faced by Officer Pittman. To be sure, there are prior cases in this circuit in
 which a use of force was reasonable one moment but was unreasonable in the next.
 
 See
 

 Brockington v. Boykins
 
 ,
 
 637 F.3d 503
 
 (4th Cir. 2011) ;
 
 Waterman v. Batton
 
 ,
 
 393 F.3d 471
 
 , 476 (4th Cir. 2005). From these cases it is evident that, as a general matter, an officer's use of force must be examined at the moment it takes place. The district court did not disagree with that proposition, nor do I. What mattered in our prior cases, however, and what ought to matter here, is whether the risk facing the officer was still present when force was used. In
 
 Waterman
 
 , officers continued to fire on a car after the "vehicle passed the officers,"
 
 393 F.3d at 480
 
 , while the officer in
 
 Brockington
 
 fired additional gunshots after the plaintiff "fell off the porch onto the concrete backyard below,"
 
 637 F.3d at 507
 
 . Neither case bears any resemblance to the one here. In this case, Pittman was in an isolated patch on a dark night. He was indisputably facing a man who had struggled to grab his weapon, sought by his own admission to shoot him in the head, fought through taser wire, ignored an order to "get down, get down," and had earlier disregarded clear warnings to stop. There was no break in the action. Pittman could well and reasonably believe that he was faced with a mortal threat and he was permitted to respond accordingly.
 

 It may be that one day this court will openly announce what is implicit here: a rule of constitutional law that subjects a police officer to liability for trying to save his life. I rather doubt, however, that our founding document forces officers to play roulette with their own existence. All we have ever needed to resolve this case is the recognition that no such unfeeling rule currently exists. Qualified immunity shields all but those are "plainly incompetent or ... knowingly violate the law,"
 
 Malley v. Briggs
 
 ,
 
 475 U.S. 335
 
 , 341,
 
 106 S.Ct. 1092
 
 ,
 
 89 L.Ed.2d 271
 
 (1986), and Officer Pittman is clearly not deserving of either label. He has violated no clearly established right, or any other right for that matter, and he is entitled to immunity.
 

 III.
 

 Interactions between citizens and police continue on edge, and minority communities and neighborhoods have justly felt that race brings with it an unwarranted presumption of wrongdoing. The Fourth Amendment, invaluable as it is, is but an imperfect check on the invisible hand of discriminatory enforcement. These grievances are now rightly garnering increased attention, but attention to one side of a fraught equation raises the risk that the other side will be neglected.
 

 And there is another side. "Nationwide, interest in becoming a police officer is down significantly."
 
 See
 
 Tom Jackman, Who Wants to be a Police Officer? Job Applications Plummet at Most U.S. Departments: Perceptions of Policing, Healthy Economy Contribute to Decreased Applications at 66 Percent of Departments, Wash. Post (Dec. 4, 2018) ("Recently, [Chuck Wexler, head of the Police Executive Research Forum,] asked a roomful of chiefs to raise their hands if they wanted their children to follow them into a law enforcement career. Not one hand went up."). While this drop has many causes, unwarranted disrespect for the police profession is surely one.
 

 Police work, like the calling of many a skilled tradesman, has often been handed down through the generations in America, but self respect depends in part upon societal respect, and that for officers is sadly ebbing. Court decisions that devalue not only police work but the very safety of officers themselves risk severing those bonds of generational transmission that have so sustained the working classes of our country. It is a shame, because professional police work helps to bridge the gulf between the haves and have nots in a
 community and protects our most vulnerable and dispossessed populations. Law must sanction officers who would abuse their power or disregard controlling law; it should not scare off those who worry that no matter what they do or whom they protect, they cannot avoid suits for money damages.
 

 When Officer Pittman emerged from that tree line, "gasping for air and ... in physical pain," J.A. 250, he ought to have been greeted with respect. Instead he has been pulled from one fight and thrust into another, this time in a courtroom. The district court in this case applied our precedent faithfully and the officer here showed conspicuous courage. I cannot join a decision that engineers such a perverse punishment for his actions and tells future officers that they cannot preserve their very lives without having their conduct assessed through the uncomprehending lens of hindsight.
 

 The second-guessing will have no end. If not now, never.